823 A.2d 38

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RICHARD GARY HOLLAND, DEFENDANT–
APPELLANT.

Argued March 17, 2003—Decided June 3, 2003.

346

*Linda Mehling,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Michael J. Williams,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney; *Mr. Williams* and *Joseph H. Enos, Jr.,* Assistant Gloucester County Prosecutor, on the briefs).

The opinion of the Court was delivered by

VERNIERO, J.

This case implicates defendant's right to be free of unreasonable searches and seizures in a residential setting. We are called on to apply the "independent-source" rule, which "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams,* 467 *U.S.* 431, 443, 104 *S.Ct.* 2501, 2508, 81 *L.Ed.*2d 377, 387 (1984). Although prior New Jersey decisions have cited the independent-source rule with varying elaboration, this case presents our first opportunity to articulate the rule's contours. For the reasons that follow, we hold that the rule cannot sustain what otherwise was an impermissible search of defendant's home.

I.

We derive our summary of facts largely from testimony presented before the trial court at a suppression hearing. On August 19, 1995, at approximately 4:45 p.m., a patrolman from the Glassboro police department responded to a call to assist an ambulance crew at 33 South Academy Street. That address consists of half of a duplex that shares a common porch with its other half, which is located at 31 South Academy Street. When the patrolman walked toward the porch he "noticed a very strong odor of burning marijuana." The officer, who at that juncture had been on the police force for about three-and-one-half years, stated that he knew the smell of burning marijuana based on his experience and training at the police academy. He noticed that the smell had decreased when he entered the residence at 33 South Academy Street.

After the ambulance crew had departed the scene, the patrolman radioed for backup officers to assist him in locating the source of the marijuana odor. Two other patrolmen and a sergeant arrived for that purpose. They also smelled the marijuana odor, and all four officers determined that the odor was emanating from the side of the duplex at 31 South Academy Street.

One of the patrolmen and the sergeant went to the residence's front door while the other two officers went around to the back door. The officers planned to knock on the front door to "see if anybody answered the door, basically so [they] could see if there was someone ... that was actually smoking marijuana in the residence." The officers heard laughter and conversation among the house's occupants. The sergeant knocked on the front door and announced very loudly, "Glassboro Police, could you open the door please." Through an open front window, one of the patrolmen observed a man, later identified as defendant Richard Gary Holland, run toward the house's rear.

Another patrolman, who was stationed by the back door, observed the same man. The officer witnessed defendant move toward the house's rear, turn toward a freezer in the kitchen, and

then exit the house through the back door. Outside, defendant dropped some vegetation on the ground that the patrolman suspected was a small piece, or "bud," of marijuana. The officer and one of his fellow patrolmen handcuffed and arrested defendant with the assistance of the other two officers. One patrolman asked defendant if there were any other occupants in the house, and defendant responded yes.

According to one of the patrolmen, two officers then entered the house to secure the officers' safety and "to determine if [any other] person was part of a crime." On the first floor the officers observed, but did not seize, "numerous items of drug paraphernalia, cases of rolling papers, rolling paper machines[, and] marijuana roaches in the ashtray in the living room." Another person, later identified as co-defendant Joseph Meril Petryk, walked down the stairway from the second floor. In response to a question from the sergeant, Petryk informed the officer that he did not know whether there were other occupants in the house.

The officers proceeded to the second floor where they observed in plain view several items, including numerous assorted glassine bags, a scale, green vegetation that they suspected was marijuana, and drug paraphernalia. In addition, the officers discovered a room lined with aluminum foil with a venting system in the ceiling that one of the patrolmen suspected was a "grow room" for marijuana. The officers seized none of the items found on the second floor.

The officers proceeded to the basement. After he entered the stairway, one of the patrolmen observed a handgun case containing a Colt .45 semi-automatic pistol, which the officer secured for his protection. In the basement the officers observed a room constructed of plywood, approximately eight feet by eight feet, that contained a rotating light on a timer, irrigation lines, numerous plants, and fertilizer. They determined that the plywood room was another place to grow marijuana, similar to the room on the second floor.

Two officers moved to the kitchen to ascertain whether defendant had placed something, such as a weapon, in the freezer. They looked in the freezer and found, but did not seize, "[t]wo very large clear plastic bags containing a green-brown vegetation" suspected to be marijuana. Only after the officers had searched and secured the entire house, did the sergeant notify a fifth officer, a detective, about what they had seen. The detective then assumed the investigation.

That same day the detective drafted a search warrant application and supporting affidavit. He described in detail the facts summarized above, including what the first set of officers had observed inside defendant's home as related to the detective by those officers. On that basis, a Superior Court judge issued a search warrant. The police executed that warrant and "rediscovered" and seized the objects initially observed by the patrolmen and sergeant.

A grand jury charged defendant with fourth-degree possession of more than fifty grams of marijuana in violation of *N.J.S.A.* 2C:35–10(a)(3); fourth-degree possession of more than fifty grams of marijuana within 1000 feet of a school, in violation of *N.J.S.A.* 2C:35–10(a)(3); third-degree possession with intent to distribute marijuana in a quantity of more than one ounce but less than five pounds, in violation of *N.J.S.A.* 2C:35–5(a)(1) and –5(b)(11); third-degree possession with intent to distribute marijuana in a quantity of more than one ounce but less than five pounds within 1000 feet of a school, in violation of *N.J.S.A.* 2C:35–5(a)(1), –5(b)(11), and –7; and first-degree maintaining or operating a marijuana production facility, in violation of *N.J.S.A.* 2C:35–4.

Defendant moved to suppress the evidence derived from the search of his home. The trial court denied that motion. Thereafter, a jury found defendant guilty on the possession and intent to distribute counts, but deadlocked on the school-zone charges. The State retried defendant on those counts, and a second jury found him not guilty. (The trial court previously had entered a consent order dismissing the indictment's production-facility count.) The

trial court sentenced defendant to a two-year probationary term conditioned on community service, ordered a six-month suspension of his driver's license, and assessed the usual monetary penalties and fees.

Before the Appellate Division, defendant appealed his conviction by challenging the trial court's denial of his suppression motion. In a reported decision, the Appellate Division considered whether probable cause and exigent circumstances had existed to justify the initial warrantless search of defendant's home. *State v. Holland,* 328 *N.J.Super.* 1, 6, 744 *A.*2d 656, *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000). The court concluded that "the distinctive smell of burning marijuana" had provided the officers with "probable cause to believe that one or more persons on the premises from which the odor was emanating possessed an unknown quantity of marijuana, a disorderly persons offense." *Id.* at 7, 744 *A.*2d 656. The court explained, however, that a disorderly persons offense is considered a "minor offense" and as such, it would " 'rarely support a finding of exigent circumstances sufficient to justify a warrantless home entry[.]' " *Id.* at 9, 744 *A.*2d 656 (quoting *State v. Bolte,* 115 *N.J.* 579, 597, 560 *A.*2d 644, *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989)).

In view of that analysis, the Appellate Division concluded that it could not sustain the warrantless entry and search of defendant's home on the basis of exigent circumstances. *Id.* at 11, 744 *A.*2d 656. The court also observed that "[t]here is no merit to the State's contention that the circumstances authorized the police to make a 'protective sweep' of the premises because there was no evidence to support a reasonable belief on the part of the police that they were in danger before they entered the house." *Id.* at 4 n. 1, 744 *A.*2d 656. Accordingly, it remanded the case to the trial court for that court to "determine whether the evidence should be suppressed or whether it may be admissible pursuant to" the independent-source rule. *Id.* at 11, 744 *A.*2d 656.

On remand, the trial court considered the parties' briefs, reviewed the transcript of the earlier suppression hearing, and

heard argument of counsel. Applying the independent-source rule, the court again denied defendant's motion to suppress, and the Appellate Division affirmed in an unreported opinion. We granted defendant's petition for certification, 174 *N.J.* 192, 803 *A.*2d 1164 (2002), and now reverse.

## II.

### A.

These familiar principles serve as the starting point of our analysis:

> Consistent with the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, police officers must obtain a warrant from a neutral judicial officer prior to searching a person's home, unless the search falls within one of the recognized exceptions to the warrant requirement. Before issuing a warrant, the judge must be satisfied that there is probable cause to believe that a crime has been committed, or is being committed, at a specific location or that evidence of a crime is at the place sought to be searched.
>
> [*State v. Sullivan*, 169 *N.J.* 204, 210, 777 *A.*2d 60 (2001) (internal quotation marks and citations omitted).]

As a general rule, evidence directly seized in violation of the warrant requirement is suppressed at trial. *Mapp v. Ohio*, 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961). Sometimes the police obtain evidence not as a primary result of warrantless conduct, but as a consequence of it. During an illegal search, for example, the police might acquire information that leads to other evidence useful to prosecutors. Under that circumstance, the later-derived evidence might be suppressed or excluded as "fruit of the poisonous tree." *Nix, supra,* 467 *U.S.* at 441, 104 *S.Ct.* at 2508, 81 *L.Ed.*2d at 386. The well-accepted purpose of excluding such primary or derivative evidence is "to compel respect for the constitutional guarantee in the only effective way–by removing the incentive to disregard it." *United States v. Calandra,* 414 *U.S.* 338, 347, 94 *S.Ct.* 613, 620, 38 *L.Ed.*2d 561, 571 (1974) (internal quotation marks and citation omitted); *see also State v. Evers,* 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003) (describing deterrent effect of exclusionary rule).

The exclusionary rule, however, is not absolute. One exception is the independent-source rule. As noted, that exception "allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix, supra,* 467 *U.S.* at 443, 104 *S.Ct.* at 2508, 81 *L.Ed.*2d at 387. The rule's federal genesis can be traced to *Silverthorne Lumber Co. v. United States,* 251 *U.S.* 385, 40 *S.Ct.* 182, 64 *L.Ed.* 319 (1920). In *Silverthorne,* the United States Supreme Court stated that if the police acquired facts from evidence obtained in violation of the Fourth Amendment, those facts did not become "sacred and inaccessible" for all purposes. *Id.* at 392, 40 *S.Ct.* at 183, 64 *L.Ed.* at 321. The Court explained that "[i]f knowledge of [the illegally obtained facts] is gained from an independent source they may be proved like any others[.]" *Ibid.*

One of the earliest reported New Jersey references to the independent-source doctrine is found in *State v. Black,* 5 *N.J. Misc.* 48, 135 *A.* 685 (1926), a decision of the then-sitting Court of Quarter Sessions. (Under New Jersey's 1776 constitution, the Court of Quarter Sessions was one of "[t]he principal courts dealing with criminal matters[.]" Edward B. McConnell, *A Brief History of the New Jersey Courts,* 7 *West's New Jersey Digest* 351 (1954). The court continued under our 1844 constitution, but ultimately was replaced by the judicial structure established by the 1947 constitution. *Id.* at 354.) In *Black, supra,* the court cited *Silverthorne,* observing "that evidence once obtained by the government by unreasonable search and seizure must remain effectively suppressed against any further subpoena or search warrant unless such subpoena or search warrant is based upon evidence obtained independently of the articles ordered returned or the information illegally obtained[.]" 5 *N.J. Misc.* at 49, 135 *A.* 685.

More recently, this Court approvingly cited *Silverthorne* in *State v. Hunt,* 91 *N.J.* 338, 450 *A.*2d 952 (1982), in which we discussed the consequence to prosecutors when the police obtain evidence as fruit of the poisonous tree. That form of evidence, the

Court declared, "is not automatically inadmissible. If the subsequently obtained evidence was acquired from an independent source unrelated to the illegal search, ... then such evidence is admissible." *Id.* at 349, 450 *A.*2d 952 (internal citations omitted). The underlying issue in *Hunt* was whether Article I, paragraph 7 of the New Jersey Constitution protects a citizen's telephone billing records. Accordingly, the Court's reference to the independent-source rule indicates that the rule is an established part of our State's constitutional jurisprudence. *See also State v. Ravotto,* 169 *N.J.* 227, 245, 777 *A.*2d 301 (2001) (referring briefly to independent-source doctrine in search-and-seizure case decided under both Fourth Amendment and Article I, paragraph 7).

### B.

As the foregoing discussion demonstrates, New Jersey courts have been referring to the independent-source doctrine for the past seventy-five years. Straightforward in design, the rule is not necessarily straightforward in application. A frequently cited federal case on the subject is *Murray v. United States,* 487 *U.S.* 533, 108 *S.Ct.* 2529, 101 *L.Ed.*2d 472 (1988). There, federal agents received a tip that the defendant and other persons were involved in a conspiracy to possess and distribute illegal drugs. Conducting a surveillance, the agents observed the defendant and his alleged co-conspirator drive separate vehicles to a Boston warehouse. *Id.* at 535, 108 *S.Ct.* at 2532, 101 *L.Ed.*2d at 479. Twenty minutes later, the two men drove their respective vehicles away from the warehouse, transferring them to other drivers. *Ibid.* The agents followed those drivers and ultimately arrested them. *Ibid.* The vehicles contained marijuana. *Ibid.*

The agents returned to the warehouse, forcing their entry without a warrant. *Ibid.* Inside, the agents observed no occupants but saw in plain view numerous burlap-wrapped bales that later were confirmed to contain marijuana. Some of the agents then sought a search warrant, while the warehouse was kept under surveillance. *Ibid.* The agents did not, however, reveal in their

warrant application that they previously had entered the targeted premises. *Id.* at 535–36, 108 *S.Ct.* at 2532, 101 *L.Ed.*2d at 479. The magistrate issued a warrant based on information that the agents had learned prior to their warrantless entry. *Id.* at 536, 108 *S.Ct.* at 2532, 101 *L.Ed.*2d at 479. After executing the warrant, the agents seized 270 bales of marijuana and other incriminating evidence. *Ibid.*

Before the district court, the defendant moved to suppress the evidence seized from the warehouse, arguing that the warrant was invalid because the agents did not inform the magistrate about their prior illegal entry. *Ibid.* The court denied the motion and a federal appellate court affirmed. *Ibid.*

In a four-to-three decision (two justices did not participate), the United States Supreme Court remanded the matter to the district court for a "determination whether the warrant-authorized search of the warehouse was an independent source of the challenged evidence[.]" *Id.* at 543–44, 108 *S.Ct.* at 2536, 101 *L.Ed.*2d at 484. According to the Supreme Court's majority, the issue was "whether ... assuming [the] evidence [was] obtained pursuant to an independently obtained search warrant, the portion of such evidence that had been observed in plain view at the time of the prior illegal entry must be suppressed." *Id.* at 535, 108 *S.Ct.* at 2532, 101 *L.Ed.*2d at 479.

The Court more fully instructed:

Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one.

We think this is also true with the tangible evidence, the bales of marijuana.... The independent source doctrine [rests] ... upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. *This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.*

[*Id.* at 541–42, 108 *S.Ct.* at 2535–36, 101 *L.Ed.*2d at 483–84 (internal citation and footnote omitted) (emphasis added to last sentence).]

Justice Marshall dissented. He acknowledged that the affidavit presented to the magistrate did not cite information obtained from the earlier illegal entry. *Id.* at 546, 108 *S.Ct.* at 2538, 101 *L.Ed.*2d at 486 (Marshall, J., dissenting). He nonetheless would have suppressed the evidence retrieved during the second search, explaining:

When, as here, the same team of investigators is involved in both the first and second search, there is a significant danger that the "independence" of the source will in fact be illusory, and that the initial search will have affected the decision to obtain a warrant notwithstanding the officers' subsequent assertions to the contrary. It is therefore crucial that the factual premise of the exception—complete independence—be clearly established before the exception can justify admission of the evidence. . . .

To ensure that the source of the evidence is genuinely independent, the basis for a finding that a search was untainted by a prior illegal search must focus . . . on "demonstrated historical facts capable of ready verification or impeachment." In the instant case[ ], there are no "demonstrated historical facts" capable of supporting a finding that the subsequent warrant search was wholly unaffected by the prior illegal search. The same team of investigators was involved in both searches. The warrant was obtained immediately after the illegal search, and no effort was made to obtain a warrant prior to the discovery of the marijuana during the illegal search. The only evidence available that the warrant search was wholly independent is the testimony of the agents who conducted the illegal search. Under these circumstances, the threat that the subsequent search was tainted by the illegal search is too great to allow for the application of the independent source exception.

[*Id.* at 548–49, 108 *S.Ct.* at 2539, 101 *L.Ed.*2d at 487–88 (Marshall, J., dissenting) (internal quotation marks, citation, and footnote omitted).]

Complicating the analysis is a line of pre- and post-*Murray* decisions by federal and State courts holding

that if an affidavit submitted in support of an application for a search warrant contains lawfully obtained information which establishes the probable cause required for a search, evidence obtained pursuant to the warrant will not be suppressed on the ground that the affidavit also contains false or unlawfully obtained information.

358

[*State v. Chaney*, 318 *N.J.Super.* 217, 221, 723 *A.*2d 132 (App.Div.1999) (citing numerous federal and State decisions in this area of law).]

The Appellate Division confronted that complication in *Chaney*. In that case, the police arrested a man who had attempted to sell some stolen jewelry at a local store. *Id.* at 219, 723 *A.*2d 132. The man informed the police that he was staying at a nearby motel with the defendant, Walter Chaney. *Id.* at 220, 723 *A.*2d 132. After ascertaining that there were two outstanding arrest warrants for the name Walter Chaney, the police went to the motel room identified by the first man. *Ibid.* The police knocked on the door, but no one responded. *Ibid.*

The police then entered the room, only to find that the defendant had fled via the bathroom window. *Ibid.* While in the motel room, the police observed several items that certain homeowners previously had reported as stolen. *Ibid.* Based partly on what the police had observed, one of the officers involved in the prior search applied to a Superior Court judge for a warrant to search the identified motel room. *Ibid.* "The judge issued the warrant, and the police officers executed it later that day, which resulted in the discovery of property stolen in five of the burglaries [that the police had been investigating]." *Ibid.* Later, the police learned that the arrest warrants that they previously believed had been issued for the defendant were for a different Walter Chaney. *Ibid.*

The defendant moved to suppress the evidence rediscovered and seized as a result of the second search. The trial court granted that motion, and the Appellate Division reversed. *Id.* at 220–21, 723 *A.*2d 132. Writing for a unanimous panel, Judge Skillman assumed that the first entry into the motel room was unlawful. *Id.* at 221, 723 *A.*2d 132. He thus framed the issue as being "whether the warrant authorizing the search of the motel room was invalid because the warrant affidavit included a description of the apparent contraband which the police had seen during their prior unlawful entry." *Ibid.*

The court then focused on the sentence in *Murray, supra*, highlighted above, in which the Supreme Court observed that a warrant would not pass muster under the independent-source rule "if the agents' decision to seek [it] was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 487 *U.S.* at 542, 108 *S.Ct.* at 2536, 101 *L.Ed.*2d at 483 (footnote omitted). After carefully reviewing the relevant case law, Judge Skillman concluded that that single sentence in *Murray* did not refute the " 'pre-*Murray* holdings that inclusion of illegally-acquired information on a warrant affidavit does not invalidate the warrant if the affidavit's other averments set forth probable cause.' " *Chaney, supra*, 318 *N.J.Super.* at 225, 723 *A.*2d 132 (quoting *United States v. Restrepo*, 966 *F.*2d 964, 969–70 (5th Cir.1992), *cert. denied, sub. nom., Pulido v. United States*, 506 *U.S.* 1049, 113 *S.Ct.* 968, 122 *L.Ed.*2d 124 (1993)).

Consistent with that analysis, the Appellate Division reversed the trial court's suppression order, upholding the search under the independent-source rule. First, the panel redacted the affidavit and found that probable cause existed without the unlawful information. *Id.* at 225, 723 *A.*2d 132. Next, the panel determined that the police would have sought a warrant regardless of what they previously had viewed in the motel room. *Id.* at 226, 723 *A.*2d 132. As support, the court cited testimony that indicated that the police were going "to take whatever steps were necessary to search [the] defendant's motel room" based on the untainted information that they had received from the first man they arrested. *Ibid.*

In a critical passage the court also concluded that, based on the totality of circumstances, the initial entry into the motel room was not a product of flagrant police misconduct. The panel stated:

> [W]e note that this is not a case where the police deliberately conducted an unlawful search for the purpose of confirming the presence of contraband before applying for a warrant. Rather, the information received by the police concerning the arrest warrants for a person with the same name as [the] defendant, whose last known address was the motel in which [the] defendant was registered, provided the

police with objectively reasonable grounds for believing that they were authorized to enter the motel room to execute the warrants. Consequently, there is no basis for arguing that the initial entry into the motel room constituted such flagrant police misconduct that the evidence subsequently obtained pursuant to the warrant should be suppressed to deter similar future violations of constitutional rights. *Cf. State v. Johnson,* 118 *N.J.* 639, 653, 573 *A.*2d 909 (1990) (holding that one factor in the determination of whether evidence is the "fruit" of illegal police conduct is "the flagrancy and purpose of the police misconduct") (citing *Brown v. Illinois,* 422 *U.S.* 590, 603–04, 95 *S.Ct.* 2254, 2261–62, 45 *L.Ed.*2d 416, 427 (1975)). Therefore, this case is not "an example of a 'search first, warrant later [police] mentality.'" *Murray, supra,* 487 *U.S.* at 540 n. 2, 108 *S.Ct.* at 2535 [n. 2], 101 *L.Ed.*2d at 482 [n. 2]; *see also State v. Nichols,* 253 *N.J.Super.* 273, 279–80, 601 *A.*2d 753 (App.Div. 1992).

[*Id.* at 226–27, 723 *A.*2d 132.]

Accordingly, the Appellate Division set aside the trial court's suppression order and remanded the case for trial. *Id.* at 227, 723 *A.*2d 132.

## C.

Against that backdrop of case law, defendant urges us to place a "heavy burden" on the State whenever it seeks to demonstrate that a seizure of evidence was independent of, and untainted by, earlier illegal police conduct. He advocates an approach similar to Justice Marshall's formulation in *Murray.* In response, the State asks that we follow the independent-source rule's formulation as articulated by the *Murray* Court's majority.

We agree with defendant that the government should be held to an elevated burden of proof when justifying a search under the independent-source rule. We also agree, however, with the Appellate Division's approach in *Chaney.* In other words, when applying the independent-source rule our courts must harmonize that rule with existing case law that permits redaction of tainted information from warrant applications in certain circumstances.

In so doing here, we adopt the following framework to be applied when evaluating the independent-source doctrine under Article I, paragraph 7 of the New Jersey Constitution. First, the State must demonstrate that probable cause existed to conduct the challenged search without the unlawfully obtained information. It

must make that showing by relying on factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search. Second, the State must demonstrate in accordance with an elevated standard of proof, namely, by clear and convincing evidence, that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed. Third, regardless of the strength of their proofs under the first and second prongs, prosecutors must demonstrate by the same enhanced standard that the initial impermissible search was not the product of flagrant police misconduct.

 In imposing the elevated burden, we draw on our prior case law, principally *State v. Sugar*, 100 *N.J.* 214, 238, 495 *A.2d* 90 (1985) (*Sugar* II), in which this Court articulated a standard to be used when evaluating the "inevitable-discovery" exception to the exclusionary rule. That exception

> is a variation upon the "independent source" theory, but it differs in that the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully.

> . . . .

> ... [T]he inevitable discovery doctrine is analytically similar to the independent source doctrine, in that both are intended to ensure that suppression does not outrun the deterrence objective: the prosecution is neither "put in a better position than it would have been if no illegality had transpired" nor "put in a *worse* position simply because of some earlier police error or misconduct."

> [5 Wayne R. LaFave, *Search and Seizure*, § 11.4(a) at 241, 244 (3d ed.1996) (internal citation omitted) (footnotes omitted).]

In *Sugar II, supra*, we adopted the inevitable-discovery exception but only after articulating "a restrictive formulation" that included a clear-and-convincing burden of proof imposed on the government. 100 *N.J.* at 238, 495 *A.2d* 90. Writing for a unanimous Court, Justice Handler explained in an instructive passage:

> In a case in which the State seeks to rely on the inevitable discovery exception, it is because the police have already violated the law. Evidence has been obtained unlawfully; a defendant's constitutional rights have been denied. The State itself is directly responsible for the loss of the opportunity lawfully to obtain evidence;

the State has created a situation in which it is impossible to be certain as to what would have happened if no illegal conduct had occurred. Moreover, the State itself is in possession of all relevant evidence bearing upon its ability to have otherwise lawfully discovered the evidence. Finally, the defendant is at a gross disadvantage; defendant's constitutional rights were in fact abridged, and, he is in possession of no independent evidence concerning whether the evidence that had been seized unlawfully would have otherwise been discovered through lawful means. Consequently, the State should be required to make a strong showing that, by the admission of the evidence, it is in no better position than it would have enjoyed had no illegality occurred. We conclude therefore that a "clear and convincing" burden must be imposed on the State. This, we believe, would restore a fair balance between the adversarial positions of the parties and constitute a proper accommodation of the conflicting interests of the State and the defendant.

Thus, ... [t]he State must show by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition.

[*Id.* at 239–40, 495 *A.*2d 90 (internal citations omitted).]

We reason similarly in respect of the independent-source rule. Our formulation of the rule's contours, including the elevated burden of proof imposed on the State, is necessary to "restore a fair balance between the adversarial positions of the parties and constitute[s] a proper accommodation of the conflicting interests of the State and the defendant." *Id.* at 240, 495 *A.*2d 90. Only by rigorously applying the rule's three prongs can we be satisfied that an error of the State's making does not subvert the warrant requirement under Article I, paragraph 7.

Our approach differs somewhat from Justice Marshall's dissenting opinion in *Murray.* We construe that opinion as suggesting a *per se* rule that would eliminate the independent-source doctrine whenever an officer participates, to whatever degree, in an initial warrantless search that is followed by a subsequent search based on a properly issued warrant. Our case law generally has eschewed *per se* rules (both in favor of and against the State's interests) in the search-and-seizure context. We prefer instead a case-by-case analysis guided by the totality of circumstances. *See, e.g., Sullivan, supra,* 169 *N.J.* at 216, 777 *A.*2d 60 (declining to adopt *per se* rule establishing probable cause whenever State conducts controlled-drug buy, explaining that such rule "would be

antithetical" to our jurisprudence); *Ravotto, supra,* 169 *N.J.* at 249, 777 *A.*2d 301 (emphasizing that whether police used unreasonable force in obtaining evidence does not turn on "any one factor in the analysis" but on totality of circumstances); *but see Bolte, supra,* 115 *N.J.* at 597, 560 *A.*2d 644 (adopting, in essence, *per se* rule providing that "minor offenses" cannot support finding of exigent circumstances sufficient to justify warrantless home entry).

■ That said, when the same officer participates in an improper search and in an arguably lawful one occurring only a short time later, the State's burden in demonstrating the validity of the second search will be most difficult. We echo Justice Marshall's concern that unrestrained application of the independent-source rule could "emasculate[ ] the Warrant Clause and provide[ ] an intolerable incentive for warrantless searches." *Murray, supra* 487 *U.S.* at 550, 108 *S.Ct.* at 2540, 101 *L.Ed.*2d at 485 (Marshall, J., dissenting). We address that concern by adopting the multifaceted formulation to which we have adverted. We stress that courts must apply scrupulously each part of the test, and that the government's failure to satisfy any one prong of the standard will result in suppression of the challenged evidence.

## III.

■ Having articulated an appropriate standard, we now apply it to the case at hand. Because we see no need for additional fact-finding by the trial court, we elect to resolve the suppression issue rather than return the matter to the trial court for that purpose. In so doing, we conclude that we must suppress the fruits of the search of defendant's home.

We focus our analysis on the most doubtful element of the State's argument, namely, that the officers would have sought the warrant regardless of their improper initial search. In that regard, the State argues that at least three facts demonstrate that the police officers intended to obtain a warrant apart from what they previously had observed or acquired during their illegal

entry. Those facts are: that the officers radioed for backup, that they conferred with each other after smelling the odor of burning marijuana, and that they decided to investigate the source of the odor by knocking and announcing their presence to the home's occupants. The State contends that the above factors support the trial court's determination that the police officers were committed to "investigating the criminality they had discovered" and thus would have applied for a warrant.

We disagree. We do not doubt that the officers acted reasonably in taking steps, short of the home entry, to investigate the source of the marijuana odor. We also assume that the smell of that drug, coupled with the officers' plain-view observation of the discarded "bud," heightened their suspicions. Under a clear-and-convincing standard of proof, however, we cannot conclude that the information acquired by the officers wholly apart from the impermissible search would have prompted them to secure a warrant. Most telling is the statement of one of the patrolmen that, because the officers were not authorized to seek a warrant, they had to summon a detective to the scene to decide whether one was necessary "based on the overwhelming items that *we had seen in this residence.*" (Emphasis added). That same patrolman also testified that the first set of officers had transferred the investigation to the detective to enable him "[t]o secure a warrant because of the items we saw in plain view while checking for other persons *in the residence.*" (Emphasis added).

The patrolman's testimony is reflected in the warrant application itself. Although it does include the few facts that the officers observed prior to their illegal entry, the detective's warrant application is saturated with references to the knowledge and items acquired or observed by the first set of officers once inside defendant's home. Consistent with the elevated burden of proof attendant in these circumstances, we are satisfied that the seizure of evidence cannot be sustained under the second prong of the analysis. (As a comparison, the search challenged in *Chaney* likely would have passed muster under our test here given the

totality of circumstances emphasized by the Appellate Division in that case. Because *Chaney's* actual record is not before us, we cannot express a definitive conclusion in that regard.)

In view of that conclusion, we need not address the first or third prongs, except to emphasize that, when a search involves an illegal entry into one's dwelling, that fact is relevant to the analysis. "An individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home[,] the core of [F]ourth [A]mendment rights." *State v. Johnson*, 168 *N.J.* 608, 625, 775 *A.*2d 1273 (2001) (alteration in original) (internal quotation marks omitted) (quoting *Kornegay v. Cottingham*, 120 *F.*3d 392, 399–400 (3d Cir.1997)). The fact that the police conduct in this case occurred inside defendant's residence fortifies our holding that the independent-source rule cannot sustain what otherwise was an impermissible search.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—6.

*Opposed*—None.