SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Rafael Camey** (A-73-17) (080574)

**Argued January 2, 2019 -- Decided August 1, 2019**

**LaVECCHIA, J., writing for the Court.**

The Court reviews two key pre-trial determinations involving the DNA evidence from defendant Rafael Camey, who stands charged with murder. First, the trial court ruled the results of a buccal swab that had been excluded on the basis of invalid consent inadmissible under either of the State's inevitable discovery arguments. Second, the trial court also applied an inevitable discovery analysis in rejecting the State's application to take a second buccal swab from defendant. The second determination raises a novel question: Under what circumstances, if any, may the police apply to conduct a new search for immutable evidence like DNA? Is a suspect's DNA off-limits to law enforcement for all time if an initial search was invalid? Or, are there situations in which law enforcement may seek a new buccal swab to examine a person's DNA?

On September 30, 2013, the Passaic Police Department received a 9-1-1 report of a brutally beaten body of a woman, later identified as "Katie," in a wooded area near a river bank behind a ShopRite store. Sergeant Bordamonte, the lead detective in the matter, was familiar with "Tina," a prostitute, who placed the 9-1-1 call. Bordamonte interviewed Tina, who said that Katie was "the new girl on the block" and that she saw Katie with a person she described as a "violent Mexican male" on the night before Katie's death. Tina said that she had been choked by the same man during a paid sexual encounter. She also said that the man had assaulted another woman.

Police obtained a statement from Katie's husband, who stated that Katie was a prostitute and drug addict who would "disappear for days at times." Later, Bordamonte learned that Katie's husband had been arrested for aggravated sexual assault and kidnapping and that there had been a domestic violence incident between him and Katie.

Over the next weeks, the police interviewed Tina again, as well as other people who knew Katie. The police also interviewed and took, with consent, buccal swabs from numerous individuals who were in the vicinity of where Katie's body was found. On October 20, 2013, Tina called police to report that she saw the violent male. Police responded to her location, where Tina made an on-scene identification of defendant.

1

The next night, officers went to a bar that defendant frequented after his work shift and detained him. A detective advised defendant of his Miranda rights and interviewed him in Spanish, his native language, but presented him with a consent form for a buccal swab printed in English. After defendant signed the untranslated form, another detective took a buccal swab from defendant and released him. Several weeks later, Bordamonte sent defendant's DNA sample, along with the approximately twenty other samples collected from local homeless individuals, to the State Police Laboratory for testing.

On June 25, 2014, the State Police notified Bordamonte that DNA found on Katie's body matched defendant's DNA profile. That day, defendant was placed under arrest and charged with felony murder, murder, and aggravated sexual assault.

During pre-trial applications, the trial court was required to evaluate defendant's consent to the buccal swab. The court determined that the consent obtained from defendant was invalid and ordered suppression of the DNA test results from that swab, holding that the swab was the product of an illegal detention, the consent form presented to defendant was written in English and never translated for defendant into his native Spanish, and defendant was never informed of his right to refuse or that the DNA would be sent to a police lab for analysis in a criminal investigation.

Thereafter, the trial court also rejected the State's further argument that the swab's results were admissible under the inevitable discovery exception to the exclusionary rule. The court followed the formulation of that doctrine adopted for use in New Jersey in State v. Sugar, 100 N.J. 214 (1985) (Sugar II). The court determined that the State failed to show that proper, normal and specific investigative procedures would have been pursued. The court noted there was "little urgency" and "little use of legal process" throughout the investigation and referenced Bordamonte's "infrequent use of the legal process," throughout his career. The court further pointed to other investigatory failings or shortcomings, citing as "shocking" the failure to interview defendant's roommates or co-workers regarding his whereabouts on the night of the murder, and the failure to seek a search warrant for the home of Katie's husband, despite his criminal history, including his prior incident of domestic violence involving the victim.

The court rebuffed the State's argument that it would have inevitably obtained defendant's DNA because police are statutorily required to take a DNA sample from persons arrested for certain enumerated violent crimes including sexual assault (with which defendant was charged here). Because defendant was arrested primarily based on the illegally obtained DNA sample, the court would not allow the State to rely on an arrest based on those DNA results to justify the taking of another swab. Moving on to the State's application to compel defendant to provide a new buccal swab under Rule 3:5A, the trial court denied the motion. The court concluded that the application must also be evaluated under inevitable discovery and held that the doctrine's application already had been rejected by the court.

2

The Appellate Division affirmed on interlocutory appeal, and the Court granted the State's motion for leave to appeal. 234 N.J. 6 (2018).

**HELD:** The Court affirms the suppression of DNA evidence from the first buccal swab. The trial court's thorough and detailed reasons for denying admission of this evidence, under either of the State's two inevitable discovery arguments, are clearly sustainable on appeal. However, the State's application for a second buccal swab calls for a remand for further proceedings consistent with this opinion and its new test, derived in part from aspects of the independent source doctrine: To apply for a new buccal swab for DNA evidence under Rule 3:5A, the State must demonstrate probable cause for the new search. That showing may include evidence that existed before the initial invalid search, but cannot be tainted by the results of the prior search. In addition, to deter wrongdoing by the police, the State must show by clear and convincing evidence that the initial impermissible search was not the result of flagrant police misconduct.

1. A buccal swab is a common method to collect specimen material for DNA testing. But it is also a "search," and must be obtained in a manner consistent with constitutional search and seizure principles for valid use in a criminal prosecution. To pass muster, a search must be conducted pursuant to a search warrant or must fall within an exception to the warrant requirement. Obtaining voluntary consent to conduct a buccal swab is one way to obtain a constitutionally valid swab without a search warrant. Another means for obtaining a swab is to utilize judicial authority to compel a suspect to submit to an investigative detention. Pursuant to Rule 3:5A-1, investigative detention orders can compel a defendant "to submit to non-testimonial identification procedures for the purpose of obtaining evidence of that person's physical characteristics." Rule 3:5A-4 provides the substantive standards for issuance of such an order. (pp. 17-20)

2. Whereas consent can serve as an exception to the warrant requirement, the inevitable discovery doctrine under Sugar II can preserve the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement. The Court agrees with the trial court's determination that inevitable discovery was the correct prism through which to evaluate the State's request to avoid exclusion of the DNA results from defendant's illegal buccal swab. While no published New Jersey opinion has applied the inevitable discovery doctrine to immutable DNA evidence, many other states have. The Court rejects arguments that DNA identification evidence is exempt from an inevitable discovery analysis merely because it reveals uniquely identifying information about an individual's identity. The trial court and Appellate Division here correctly determined that the doctrine could be used to evaluate DNA evidence. (pp. 21-27)

3. The Court also agrees with the trial court's application of the inevitable discovery standard to defendant's buccal swab and has no difficulty affirming its findings, which were based on the determination that the State failed to meet the first prong of the Sugar II test by clear and convincing evidence. The State argues that police either would have

3

applied for a search warrant or an investigative detention to obtain a buccal swab from defendant or would have acted on its probable cause to arrest him. But the events of the actual investigation suggest otherwise, as the trial court found. (pp. 27-30)

4. The trial court also used an inevitable discovery analysis to parse the State's application under Rule 3:5A for an order to take a new buccal swab and rejected the request essentially for the reasons already given in its previous inevitable discovery ruling. The Court is unconvinced that an inevitable discovery framework is correct in these circumstances. The doctrine generally addresses completed searches that cannot be replicated. A key factor in the trial court's decision here was its perception that the State was seeking to obtain through legal means the same evidence that it had earlier obtained unlawfully. But DNA is not an item like guns, drugs, or documents. A new DNA sample might provide the same information as the original sample, but each sample is evidence in its own right -- and the exclusionary rule bars the use of the same evidence that was illegally obtained or "poisoned fruit" evidence that would not have been discovered but for the initial, illegally obtained evidence. The State's request to compel a new sample must therefore be viewed for what it truly is: a request to obtain a new buccal sample -- new evidence -- notwithstanding that it will lead to the same uniquely identifying information that DNA provides. A properly issued judicial order under Rule 3:5A-4 should be available to law enforcement, on the right terms. (pp. 30-33)

5. The Court fashions a standard tailored for the unique nature of DNA evidence and a fair assessment of whether a second buccal swab sample should be allowed. The test is derived in part from aspects of the independent source doctrine, as set forth in State v. Holland, 176 N.J. 344, 360-62 (2003). Noting that flagrancy is a high bar that requires active disregard of proper procedure, or overt attempts to undermine constitutional protections, the Court adopts the following test: First, the State must demonstrate that probable cause exists to conduct the new search. The court should look at the showing advanced by the State to demonstrate probable cause. The evidence may involve the same evidence that existed at the time of the illegal search. Thus, Tina's statements and her identification of defendant are not off-limits. Second, the court should determine whether the State's showing of probable cause is untainted by the results of the prior search. Here, that means that the probable cause must be independent of the information obtained through the results from the prior swab. Third, to deter wrongdoing by the police, the Court requires the State to show by clear and convincing evidence that the initial impermissible search was not the result of flagrant police misconduct. The Court notes that a buccal swab is minimally intrusive and stresses that it is considering only a Rule 3:5A application which addresses minimally intrusive identification procedures. The Court remands to allow the State to demonstrate whether it can meet the standard announced. Because the original judge made extensive credibility determinations about the witnesses before the court, as well as about Tina, who was not before the court, the Court refers this matter to the Assignment Judge for assignment. (pp. 33-36)

4

**The judgment of the Appellate Division is AFFIRMED IN PART and REVERSED IN PART, and the matter is REMANDED for further proceedings.**

**JUSTICE ALBIN, dissenting,** expresses the view that there is no basis to reverse the trial court's suppression order and to remand before a different judge, because the State cannot prove by clear and convincing evidence that the police officers did not engage in flagrant misconduct when they unlawfully detained Camey three times, unlawfully interrogated him, and unlawfully secured a buccal swab without his consent. Justice Albin notes that the trial court properly applied the inevitable discovery doctrine -- the theory presented by the State at the suppression hearing -- and that its factfindings must be accorded deference. Justice Albin also explains that the majority's retreat from Holland's rigorous independent source test -- the test for determining whether a "seizure of evidence was independent of, and untainted by, earlier illegal police misconduct" -- diminishes the deterrent effect of the exclusionary rule. In Justice Albin's view, allowing the State to rely on the same evidence to establish probable cause permits the police a do-over after a failure to adhere to constitutional dictates.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a dissent.**

5

SUPREME COURT OF NEW JERSEY

A-73 September Term 2017

080574

State of New Jersey,

Plaintiff-Appellant,

v.

Rafael Camey,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 2, 2019 | August 1, 2019 |

Lila B. Leonard, Deputy Attorney General, argued the cause for appellant (Gurbir S. Grewal, Attorney General, attorney; Lila B. Leonard, of counsel and on the brief, and Christopher W. Hsieh, Chief Assistant Passaic County Prosecutor, on the brief).

Stefan Van Jura, Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, of counsel and on the brief, and Laura C. Sutnick, Designated Counsel, on the brief).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Tess Borden, Edward Barocas, and Jeanne LoCicero, on the brief).

1

In this case, defendant Rafael Camey stands charged with murder. The police discovered the victim's lifeless body behind a supermarket in Passaic and swabbed it for DNA evidence. The victim had been brutally beaten and was partially disrobed; the cause of her death was blunt force trauma and drowning.

The ensuing investigation led the police to search for a particular violent individual with whom the victim had been seen. To try to solve the crime, the police swabbed multiple individuals for DNA including defendant. His DNA profile matched the DNA found in the victim. In this interlocutory appeal, we review two key pre-trial determinations involving the DNA evidence from defendant.

First, after the trial court granted defendant's motion to suppress DNA results from a buccal swab obtained on the basis of invalid consent, which the State no longer contests, the State sought admission of the excluded DNA results on the basis of inevitable discovery. The State argued that it could have obtained a buccal swab from defendant under N.J.S.A. 53:1-20.20 or through an application for investigative detention under Rule 3:5A-4. The trial court agreed to employ an inevitable discovery analysis and ruled the results

from that buccal swab inadmissible under either inevitable discovery argument. The Appellate Division affirmed the suppression of the results from that swab.

Second, the State filed a separate application under Rule 3:5A-4 to take a second buccal swab from defendant. The court again turned to the framework of an inevitable discovery analysis and rejected the application. The Appellate Division again affirmed.

Like the trial court and the Appellate Division, we hold that the police violated the Fourth Amendment in the way they obtained defendant's DNA. As a result, the results from that search cannot be used.

DNA evidence, however, is immutable. It is unlike a completed search of a home in which the police already removed contraband -- a search that cannot be repeated. After a person is swabbed for DNA, of course, his DNA remains intact. It will be the same ten years from now as it was several years ago. The application for a second buccal swab from defendant calls into question the standard to which the State should be held when making an application for a judicially sanctioned swab as part of an investigative detention, see R. 3:5A-4, after the State's previous swab -- secured through an unconstitutional search and seizure -- was excluded. Notwithstanding the immutability of DNA information, the second buccal swab does not lose its

3

character as a second search and seizure merely because the new buccal evidence will provide the same uniquely identifying information available from an individual's DNA that the initial buccal evidence provided.

The appeal thus raises a novel question: Under what circumstances, if any, may the police apply to conduct a new search for immutable evidence like DNA? Is a suspect's DNA off-limits to law enforcement for all time if an initial search was invalid? Or, are there situations in which law enforcement may seek a new buccal swab to examine a person's DNA?

We conclude that a traditional inevitable discovery "look-back" analysis for alternative reasoning to support admission of already-seized evidence is a poor fit for the analysis needed in these circumstances. Instead, we draw from the independent source doctrine to analyze the question and frame an appropriate test. To apply for a new buccal swab for DNA evidence under Rule 3:5A, we conclude that the State must demonstrate probable cause for the new search. That showing may include evidence that existed before the initial invalid search, but the showing cannot be tainted by the results of the prior search. In addition, to deter wrongdoing by the police, the State must show by clear and convincing evidence that the initial impermissible search was not the result of flagrant police misconduct. The approach adopted protects a

4

suspect's constitutional rights and recognizes the legitimate public interest in a fair assessment of whether a second buccal swab sample should be allowed.

In sum, we affirm the suppression of DNA evidence from the first buccal swab. We hold that the trial court's thorough and detailed reasons for denying admission of this evidence, under either of the State's two inevitable discovery arguments, are clearly sustainable on appeal. However, the State's application for a second buccal swab calls for a remand. We vacate the Appellate Division's affirmance of the denial of the State's application to take a new buccal swab from defendant and remand for further proceedings consistent with this opinion and the new test set forth herein.

## I.

The pertinent facts from the pre-trial applications and related evidential proceedings involve the State's investigation into the death of a woman whose body was discovered in a secluded area of Passaic and the narrowing of the investigation to defendant.

A little after 6:00 p.m. on September 30, 2013, the Passaic Police Department received a 9-1-1 report of a body in a wooded area near a river bank behind a ShopRite store. Sergeant Bordamonte, the lead detective in the matter, testified that the deceased -- later determined to be a woman named

Katie[1] -- had been "beaten very, very brutally" and was partially disrobed. An autopsy revealed that the cause of death was blunt force trauma and drowning.

Bordamonte was familiar with Tina, the person who placed the 9-1-1 call. The police knew she was a prostitute who frequented the area where Katie's body was located and that she had provided useful information in other police investigations.

Bordamonte interviewed Tina the day after Katie's body was found. Tina told Bordamonte that Katie was "the new girl on the block" and that she saw Katie with a person she described as a "violent Mexican male" (the violent male) at about 11:00 p.m. on the night before Katie's death. Tina said that she had been choked by the same man during a paid sexual encounter. She also said that the man had assaulted another woman, Ashley, and that a friend, Dennis, would be better able to describe this man because Dennis "definitely knows who he is."[2] Bordamonte showed Tina photographs from the police database and later drove her around in the hope that she might recognize the man she recalled seeing with Katie. Neither effort produced an identification, and Tina agreed to contact the police if she saw the man again. According to

---

[1]  We have assigned fictitious names to many individuals discussed herein, including the victim, her husband, and the informant.

[2]  Those statements were not borne out in independent interviews of Ashley and Dennis.

6

Bordamonte, Tina appeared to be under the influence of an intoxicating substance during this initial interview.

Later that day, police obtained a statement from Katie's husband, Martin. According to Martin, Katie was a prostitute and drug addict. He said that he had not seen her for one or two days and that it was not uncommon for her to "disappear for days at times." Bordamonte later learned, through a criminal history search, that Martin had been arrested for aggravated sexual assault and kidnapping and that there had been a domestic violence incident between him and Katie.

Three days after finding Katie's body, Bordamonte conducted a second interview with Tina in which she repeated that she last saw Katie with the violent male the night before her body was found. During this interview, Tina again appeared to Bordamonte to be under the influence of drugs.

That same day, police officers conducted on-scene interviews with approximately sixteen homeless individuals who were in the vicinity of where Katie's body was found and from whom the police received consent to take buccal swabs. None of the individuals whom the police interviewed and swabbed were able to provide information related to Katie's death. Beforehand, police had administered buccal swabs to at least four other homeless individuals who were in the area near where Katie's body was found.

On October 8, 2013, police interviewed a friend of Katie's, Penny, who reported that Katie and Martin were having "marital problems." Penny also stated that, on the night before Katie's body was found, she saw her with a man named Richard and she believed Richard was involved in the murder because he had not been back since that night. Richard was subsequently interviewed, and he confirmed that he saw Katie the night before her body was found. Others interviewed by Bordamonte included a woman who reported that she had acted as a lookout for Katie while Katie had a sexual encounter with a Polish man the day she was killed. According to this report, Katie and that man were alone for a long time.

On October 18, 2013, Tina was interviewed for a third time. She reiterated that she last saw Katie walking away from others toward a more secluded area with the so-called violent male and added that the "rumor in the street" was that someone called "Blaze" killed Katie.[3] Two days after this interview, Tina called police to report that she saw the violent male about whom she had been telling them. Police responded to her location, where Tina made an on-scene identification of defendant by pointing him out.

_____

[3] At the suppression hearing, Bordamonte could not confidently confirm that Tina was under the influence of drugs during the October 18 interview, unlike his observations from earlier interviews, but he stated that her behavior that day suggested that she may have been.

8

Thus, despite the investigation leading in various directions, by October 21, 2013, defendant was a person of interest in the investigation into Katie's murder. That night, officers went to a bar that defendant frequented after his work shift and detained him. Detective Alex Flores advised defendant of his Miranda[4] rights and interviewed him in Spanish, his native language. Flores also presented defendant with a consent form for a buccal swab printed in English. After defendant signed the untranslated form, another detective took a buccal swab from defendant and released him.

Several weeks later, on January 13, 2014, Bordamonte sent defendant's DNA sample, along with the approximately twenty other samples that the police had collected from local homeless individuals, to the State Police Laboratory for testing. Bordamonte testified that he waited so he could submit the samples in a single group, conceding that the submission "was a touch delayed."

On March 18, 2014, Tina provided police with another formal statement, this time shortly after her incarceration, during which she was drug-free. This statement was consistent with her previous statements regarding Katie and the violent male. Also, after viewing photographs depicting eighteen of the twenty individuals who had either consented to buccal swabs or been

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

9

interviewed as part of the investigation, Tina picked out defendant as the violent male she had described.

On April 8, 2014, police brought defendant in for a second interview. Detective Reinaldo Arroyo read defendant his Miranda rights in Spanish and repeated them, upon defendant's request, before conducting the interview. Defendant was released at the end of that interview.

On June 25, 2014, the State Police notified Bordamonte that DNA found on Katie's body matched defendant's DNA profile. That day, defendant was brought to police headquarters, was read his Miranda rights in Spanish, and spoke with police for several hours. He was placed under arrest at the conclusion of that interview and charged with felony murder, N.J.S.A. 2C:11-3(a)(3); murder, N.J.S.A. 2C:11-3(a)(1); and aggravated sexual assault, N.J.S.A. 2C:14-2(a)(6).

## II.

During pre-trial applications, the trial court was required to evaluate defendant's consent to the buccal swab. The court already had ordered the suppression of defendant's three statements, which the State does not contest on appeal. With respect to the buccal swab, the court determined that the consent obtained from defendant was invalid and ordered suppression of the DNA test results from that swab. The court held that the swab was the product

10

of an illegal detention, the consent form presented to defendant was written in English and never translated for defendant into his native Spanish, and defendant was never informed of his right to refuse or that the DNA would be sent to a police lab for analysis in a criminal investigation.

Thereafter, the trial court also rejected the State's further argument that the swab's results were admissible under the inevitable discovery exception to the exclusionary rule. The court followed the formulation of that doctrine adopted for use in this State in State v. Sugar, 100 N.J. 214 (1985) (Sugar II), which has a three-pronged test that the State must satisfy by clear and convincing evidence.

The court determined that the State failed to show that proper, normal and specific investigative procedures would have been pursued, rejecting, in particular, the State's assertion that Bordamonte would have applied for a search warrant for defendant's DNA had defendant denied consent. In reaching that conclusion, the court reasoned that although Bordamonte collected DNA samples from twenty "homeless males" and several other people by the time detectives obtained defendant's DNA on October 21, 2013, the swabs were not taken to the lab until January 13, 2014. The court noted there was "little urgency" and "little use of legal process" throughout the investigation and referenced Bordamonte's "infrequent use of the legal

11

process," throughout his career.[5]  The court further pointed to other investigatory failings or shortcomings as reinforcing the conclusion that police would not have obtained a warrant for DNA.  For example, the court cited as "shocking" the failure to interview defendant's roommates or co-workers regarding his whereabouts on the night of the murder, and the failure to seek a search warrant for the home of Katie's husband, Martin, despite his criminal history, including his prior incident of domestic violence involving the victim.

The court added that, even if Bordamonte had applied for a warrant or a Rule 3:5A investigative detention order when taking the buccal swab from defendant, the court "would have been very concerned as to whether the application met the standard required."  Among other things, the court cited credibility concerns attributed to Tina's criminal history and her substantial narcotics impairment at the time of two of her statements relied on by the State.

To the extent that the State argued that it would have inevitably obtained defendant's DNA because police are statutorily required to take a DNA sample from persons arrested for certain enumerated violent crimes under N.J.S.A. 53:1-20.20, including sexual assault (with which defendant was charged here), the court rebuffed the argument.  Explaining that defendant was arrested

---

[5]  The court also relied on a past internal investigation involving Bordamonte.

12

primarily based on the illegally obtained DNA sample, the court would not allow the State to rely on an arrest based on those DNA results or his suppressed statements to justify the taking of the swab sample. The court also questioned whether Tina, who had not appeared in court, had sufficient credibility to support an arrest based on her claim that she had been assaulted by defendant in the past.

Moving on to the State's application to compel defendant to provide a new buccal swab under Rule 3:5A, the trial court denied the motion. The court concluded that the application must also be evaluated under inevitable discovery and held that the doctrine's application already had been rejected by the court.

The State filed an interlocutory appeal from both rulings, which the Appellate Division granted. The Appellate Division stated that the trial court's "detailed and well-reasoned oral decision" was consistent with Sugar II and properly considered whether Bordamonte would have obtained a search warrant, rather than whether he could have. Noting that an appellate court is not at liberty to supplant the trial court's credibility determinations with its own "merely because [it] might have reached a different conclusion," the appellate court affirmed the trial court. The Appellate Division held that, "in light of the record and the judge's detailed conclusions," the trial court did not

abuse its discretion in suppressing the results of the first buccal swab, denying the State's motion to admit the evidence under inevitable discovery, and denying the motion to compel a second buccal swab also under an inevitable discovery analysis.

The State moved for leave to appeal. We granted the State's motion. 234 N.J. 6 (2018). We also granted leave to appear as amicus curiae to the American Civil Liberties Union -- New Jersey (ACLU).

### III.

The State maintains before this Court that it has shown by clear and convincing evidence that the evidence from the first buccal swab would have been inevitably discovered under the three-prong test set forth in Sugar II.

With regard to the denial of its application under Rule 3:5A to take a second buccal swab, the State argues that it has probable cause to collect defendant's DNA today "based [in part] on the robust investigation the police conducted" before obtaining defendant's DNA sample on October 21, 2013. Regardless of any alleged constitutional violation in connection with obtaining the first swab, the State argues that defendant should not be permitted to "suppress his identity."

Defendant maintains that the State failed to satisfy the Sugar test and largely relies on the trial court's findings and reasoning. Defendant also

14

disputes that the State could have obtained defendant's DNA pursuant to N.J.S.A. 53:1-20.20. And, in response to the State's argument that defendant cannot "suppress his identity" in connection with an application for a second buccal swab under Rule 3:5A and otherwise, defendant reasons that DNA is "something of evidentiary value" and, as "identity-related evidence," it can be suppressed just like other evidence.

The ACLU emphasizes that the State established only that it was plausible -- not that it was inevitable, as required under Sugar -- that Bordamonte would have applied for a warrant to search defendant had police not performed an invalid consent search. It urges that we not disturb the trial court's determinations about Bordamonte's credibility as a witness or second guess the evidence the court considered in making the determination about what he would have done. More fundamentally, the ACLU challenges the use of inevitable discovery in this setting. It contends police officers would have no incentive to seek warrants even when they have probable cause to search if they could simply argue inevitable discovery later.

The ACLU also argues that the leading inevitable discovery cases require an inevitable discovery despite -- not simply in the absence of -- the unlawful behavior. In this case, the ACLU maintains that the application for a judicial warrant to take a second buccal swab would not have occurred despite

the unlawful buccal swab.  The ACLU reasons that, because the lawful process that "would have" resulted in inevitable discovery was not independent from the unlawful process that actually was pursued, any use of the inevitable discovery doctrine in this matter should be invalid.

IV.

A.

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect individuals from unreasonable searches and seizures.  State v. Gathers, 234 N.J. 208, 219 (2018).  "Those provisions impose a standard of reasonableness on the exercise of discretion by government officials to protect persons against arbitrary invasions."  State v. Chisum, 236 N.J. 530, 544-45 (2019) (quoting State v. Maristany, 133 N.J. 299, 304 (1993)).  In balancing an intrusion against the promotion of legitimate governmental interests when performing a reasonableness analysis, the balance generally is struck "in favor of the procedures described by the Warrant Clause of the Fourth Amendment."  State v. O'Hagen, 189 N.J. 140, 149 (2007) (quoting Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 619 (1989)).

The warrant requirement interposes a neutral magistrate between the police officer and the person against whom the search is directed, unless the

16

search falls within a recognized exception to the warrant requirement.  See

State v. Sullivan, 169 N.J. 204, 210 (2001).  Evidence that is seized in

violation of the warrant requirement, and any recognized exception to it, is

excluded as a general rule.  Ibid.

Those very basic principles provide the starting point to our analysis.

B.

This appeal concerns the taking of a buccal swab from defendant, which

produced nontestimonial DNA identification information about defendant.

This is a unique category of evidence.

DNA evidence is extremely useful for identification purposes in criminal

prosecutions as well as for exonerations.  See Dist. Attorney's Office for the

Third Judicial Dist. v. Osborne, 557 U.S. 52, 55 (2009) ("DNA [evidence] has

an unparalleled ability both to exonerate the wrongly convicted and to identify

the guilty.  It has the potential to significantly improve both the criminal

justice system and police investigative practices.").  The United States

Supreme Court has stated that the difference between using DNA analysis and

fingerprint databases to identify a suspect "is the unparalleled accuracy DNA

provides."  Maryland v. King, 569 U.S. 435, 451 (2013).  As a result, "the

utility of DNA identification in the criminal justice system [has become]

17

undisputed." Id. at 442. Our own case law recognizes as much. See State v. Sterling, 215 N.J. 65, 103-04 (2013); see also O'Hagen, 189 N.J. at 163.

Presently, all fifty states require the collection of DNA for certain -- if not all -- felony convictions. King, 569 U.S. at 445; see, e.g., 34 U.S.C. § 12592 (creating federal index to facilitate law enforcement exchange of DNA identification information); N.J.S.A. 53:1-20.20 (requiring collection of DNA upon conviction of certain crimes and upon arrest for a limited set of enumerated offenses). Thus, in New Jersey, and other jurisdictions, law enforcement uses the collection of DNA as an important tool in identification.

A buccal swab is a common method of law enforcement collection of specimen material for DNA testing. But, it is also beyond dispute that the taking of a buccal swab "for the purposes of obtaining a DNA sample is a 'search.'" O'Hagen, 189 N.J. at 149 (citing Skinner, 489 U.S. at 616-17); accord Gathers, 234 N.J. at 221. And because a buccal swab constitutes a search, it must be obtained in a manner consistent with constitutional search and seizure principles for valid use in a criminal prosecution.

To pass constitutional muster, a search must be conducted pursuant to a search warrant or must fall within an exception to the warrant requirement. See Sullivan, 169 N.J. at 210. "One well-recognized exception to the warrant requirement is consent." State v. Cushing, 226 N.J. 187, 199 (2016) (citing

18

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).  Obtaining voluntary consent to conduct a buccal swab is one way to obtain a constitutionally valid swab without a search warrant.  To ensure validity, warnings given to an individual informing about the right to refuse consent help the State later carry its burden to demonstrate that the consent was truly a voluntary, knowing, and intelligent waiver of the right to be free of such an intrusion.  See State v. Johnson, 68 N.J. 349, 354 (1975).

Another means for obtaining a swab is to utilize judicial authority to compel a suspect to submit to an investigative detention, which is the functional equivalent of an application for issuance of a search warrant.  See State v. Hall, 93 N.J. 552, 557-59 (1983) (recognizing judicial authority to authorize investigative detentions founded on the Judiciary's constitutional authority governing search and seizure).  Taking a lead from the United States Supreme Court in Davis v. Mississippi, 394 U.S. 721, 727-28 (1969), our Court concluded that for certain detentions, which are minimally intrusive, produce reliable evidence, and can be effected "without abuse, coercion or intimidation," the proofs required for an investigative detention order need not rise to probable cause.  Hall, 93 N.J. at 561-62; accord In re Alleged Aggravated Sexual Assault of A.S., 366 N.J. Super. 402, 409-10 (App. Div. 2004).

19

Court rules now formalize the guidelines for issuance of an order for investigative detention to compel lineups, fingerprinting, and other minimally intrusive identification procedures. See State v. Rolle, 265 N.J. Super. 482, 486 (App. Div. 1993). Pursuant to Rule 3:5A-1, investigative detention orders can compel a defendant "to submit to non-testimonial identification procedures for the purpose of obtaining evidence of that person's physical characteristics." Rule 3:5A-4 provides the substantive standards for issuance of such an order:

> An order for an investigative detention shall be issued only if the judge concludes from the application that:
>
> (a) a crime has been committed and is under active investigation, and
>
> (b) there is a reasonable and well-grounded basis from which to believe that the person sought may have committed the crime, and
>
> (c) the results of the physical characteristics obtained during the detention will significantly advance the investigation and determine whether or not the individual probably committed the crime, and
>
> (d) the physical characteristics sought cannot otherwise practicably be obtained.
>
> [R. 3:5A-4.]

C.

Our analysis in this matter begins from the vantage point of the trial court's foundational finding that defendant's initial buccal swab was taken through invalid consent -- a finding that the State does not dispute. Rather, the State claims the results of that swab should be admitted on the basis of inevitable discovery.

Whereas consent can serve as an exception to the warrant requirement, the inevitable discovery doctrine can preserve -- if certain conditions are satisfied -- the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement. Specifically, the inevitable discovery doctrine allows for the admission of evidence obtained through law enforcement's unconstitutional conduct if that evidence would have been discovered in the absence of that unlawful conduct. See Nix v. Williams, 467 U.S. 431, 444-48 (1984). Inevitable discovery tempers the "social costs associated with the exclusionary rule" by placing "police in the same position that they would have been in had no police misconduct occurred." Sugar II, 100 N.J. at 237.

The doctrine is rooted in the deterrent goal of the exclusionary rule. To promote that objective, the exclusionary rule prevents the prosecution from being in a better position than if the illegal conduct had not taken place; it is

21

not meant to punish the prosecution by putting it in a <u>worse</u> place.  <u>Id.</u> at 236-37.  Considered a narrow exception to the exclusionary rule, our standard for allowing evidence on the basis of inevitable discovery requires the State to demonstrate, by clear and convincing evidence, <u>id.</u> at 240, that

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [<u>Id.</u> at 238.]

Our standard for inevitable discovery does not require "the State [to] demonstrate the exact circumstances of the evidence's discovery."  <u>State v. Maltese</u>, 222 N.J. 525, 552 (2015) (quoting <u>State v. Sugar</u>, 108 N.J. 151, 158 (1987) (<u>Sugar III</u>)).  Rather, "[t]he State need only present facts or elements -- proving each such fact or element by a preponderance of the evidence -- that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered."  <u>Sugar III</u>, 108 N.J. at 159.  That said, the doctrine cannot be used to elide the warrant requirement.  <u>Sugar II</u> specifically warned against that.  100 N.J. at 240 n.3 (stating that when illegal conduct "consists simply of the failure to obtain a

22

search warrant, the exception should not be applied to circumvent the warrant requirement . . . or to defeat the deterrent purposes espoused in the exclusionary rule" (citing Nix, 467 U.S. 431; United States v. Griffin, 502 F.2d 959 (6th Cir. 1974); Commonwealth v. Benoit, 415 N.E.2d 818 (Mass. 1981))).

V.

With that general background in mind, we review first the trial court's use of the inevitable discovery doctrine to evaluate the State's request to avoid exclusion of the DNA results from defendant's illegal buccal swab.

We agree with the trial court's determination that inevitable discovery was the correct prism through which to analyze the unique immutable nontestimonial identification evidence that was obtained in this case. The immutable nature of the evidence does not exempt it from the analytic framework that controls for inevitable discovery. First, nothing about our decisions in Sugar or any other related case suggests that the exclusionary rule and its exceptions do not apply with equal force to evidence based on mutable and immutable characteristics. Indeed, the Supreme Court's decision in Davis indicates that the exclusionary rule applies to both forms of evidence. 394 U.S. at 724 (discussing fingerprint evidence). And, no decision -- federal or

23

state -- has ruled that an inevitable discovery analysis may not be used with respect to such evidence.

While no published New Jersey opinion has applied the inevitable discovery doctrine to DNA evidence -- an immutable characteristic -- many other states have engaged in such an analysis using the standard.

For example, in People v. Diaz, police obtained blood and hair samples from the defendant -- who was accused of sexual assault -- without a search warrant even after he refused to voluntarily provide the samples. 53 P.3d 1171, 1173 (Colo. 2002) (en banc). After determining that taking the samples without a warrant was an illegal search and did not meet any exception to the warrant requirement, the Supreme Court of Colorado undertook an inevitable discovery analysis and held that the evidence was not admissible under the doctrine because the prosecution failed to show "that an independent police investigation was being conducted, or that the police would have inevitably discovered the evidence through such an investigation despite their misconduct." Id. at 1175-76.

Similarly, in the Louisiana decision State v. Lee, police obtained a subpoena duces tecum authorizing the taking of a buccal swab from the defendant in the course of an investigation into the serial rape and killing of multiple women. 976 So. 2d 109, 120-21 (La. 2008). The Supreme Court of

24

Louisiana determined that a subpoena duces tecum was insufficient to obtain the sample legally and concluded that the buccal swab taken from the defendant was an illegal warrantless search. Id. at 124-27. Nonetheless, the court undertook an inevitable discovery analysis and determined that the swab was admissible. Id. at 131.

The extensive police investigation in Lee demonstrated to the Supreme Court of Louisiana that "the State satisfied its burden of showing by a preponderance of the evidence there was a parallel and independent investigation unrelated to the illegal search that would have inevitably and legally yielded defendant's DNA." Ibid. The court described the multiple leads that the investigating police department had, independent of the illegal buccal swab, that would have inevitably led them to legally obtain a buccal swab from the defendant. Id. at 128-31. The court pointed to facts that showed that the police and other investigating agencies were diligently pursuing multiple independent leads based on DNA found at the crime scenes, a composite sketch which bore a striking resemblance to the defendant, a description of a car seen at one of the crime scenes belonging to the perpetrator, and multiple telephone tips. Ibid. The court explained that the police were actively working with the other agencies such as crime lab experts and a serial killer task force to solve the murders prior to receiving the results

25

of the defendant's buccal swab.  Ibid.  For those reasons, the court's evaluation led it to conclude that the necessary proofs for inevitable discovery were present.  Id. at 131.  The Supreme Court of Florida reached a similar result with respect to a blood sample obtained from the person last seen with a murder victim on the ground that, even if, as the defendant argued, the initial sample had been illegally obtained through coerced consent, the independent and preexisting investigation into the defendant would inevitably have led to a sample being legally taken.  Fitzpatrick v. State, 900 So. 2d 495, 514 (Fla. 2005).

Diaz and Lee are illustrative of the universe of cases that demonstrate that courts have been using an inevitable discovery framework to consider otherwise excluded immutable evidence as a matter of course.[6]  We reject the arguments advanced before us that DNA identification evidence is exempt from an inevitable discovery analysis merely because it reveals uniquely identifying information about an individual's identity.  The trial court and

---

[6]  See, e.g., United States v. Cherry, 759 F.2d 1196, 1207 (5th Cir. 1985) (applying inevitable discovery to illegally obtained fingerprints because law enforcement had uncovered, independent of the prior misconduct, sufficient incriminating evidence against the defendant to give rise to probable cause for his arrest, upon which the police would have eventually acted and thus lawfully obtained the defendant's fingerprints).

26

Appellate Division here correctly determined that the doctrine could be used to evaluate DNA evidence.

As for the trial court's application of the inevitable discovery standard to defendant's buccal swab, we agree with that also.

We have no difficulty affirming the trial court's detailed findings, which were based on the determination that the State failed to meet the first prong of the Sugar II test by clear and convincing evidence. The State argues that police either would have applied for a search warrant or a Rule 3:5A investigative detention to obtain a buccal swab from defendant or would have acted on its probable cause to arrest him. But the events of the actual investigation suggest otherwise, as the trial court found. Once Bordamonte and the other officers involved illegally obtained defendant's buccal swab, the investigation slowed to a virtual halt. The State concedes that the police had zeroed in on defendant as a primary suspect and that they were fully aware that DNA evidence would be the lynchpin of this case. Yet, Bordamonte testified that he did not send defendant's DNA to the lab for almost three months, during which time officers received no new information or investigative leads.

Even after Bordamonte sent defendant's DNA to the lab, investigators failed to question defendant's co-workers and roommates to ascertain his whereabouts on the night of Katie's murder or to corroborate Tina's story.

27

They also never sought to obtain a search warrant for Katie's husband's home, despite learning about his past criminal history and domestic violence against Katie.

The trial court found particularly troubling for the State's inevitable discovery analysis Bordamonte's failure to utilize legal processes to lawfully obtain critical information. Although the police could have applied for the investigative detention of defendant under Rule 3:5A or a search warrant, the test under Sugar II is whether the police would have made the applications. We will not disturb the trial court's findings; in an appeal, we defer to findings that are supported in the record and find roots in credibility assessments by the trial court. State v. Locurto, 157 N.J. 463, 471-72 (1999). Here, Bordamonte took no affirmative steps to secure legal process, making this case unlike State v. Johnson, 120 N.J. 263, 290 (1990).[7] See also State v. Premone, 348 N.J.

_____

[7] In Johnson, the Court held that the fruits of a search conducted on the basis of illegal consent were admissible under the inevitable discovery doctrine. 120 N.J. at 290. There, a detective was preparing a search warrant for the defendant's bedroom at the same time as interrogating officers obtained an illegal confession and consent from the defendant to search the bedroom. Id. at 289. At that time, the detective had typed one-and-a-half pages of the affidavit for the warrant and suspended his typing efforts only after the defendant consented to the search. Ibid. On that record, the Court determined that had the interrogating officers not illegally obtained the defendant's consent for a search, the detective would have completed the search warrant he was in the process of preparing, that the application would have been granted, and that the officers would have inevitably exercised the warrant and found the evidence. Id. at 290.

28

Super. 505, 510, 515 (App. Div. 2002) (refusing to apply inevitable discovery where the State argued it could have obtained the information through a search warrant but had not taken steps in that direction).

Nor can the State prevail on its argument that it would have obtained a buccal swab by relying on probable cause to arrest defendant for the assault on Tina and allegedly other women, according to her. Again, the State did not take any steps during the weeks it was waiting for the DNA testing to come back from the lab to respond to Tina's claims that defendant was dangerous. Our standard of proof requires that the State carry its burden by clear and convincing evidence in order for otherwise excluded evidence to be allowed in through inevitable discovery. Sugar II, 100 N.J. at 240. We are unpersuaded by the State's arguments that it has met that high standard.[8] In sum, for the reasons stated, there is no basis for disturbing the findings and conclusion of the trial court, affirmed by the Appellate Division, that the State has not

---

[8] The State relies on the Seventh Circuit case Sutton v. Pfister to support its contention that N.J.S.A. 53:1-20.20 -- which requires arrestees for certain offenses to provide DNA -- is sufficient to satisfy the inevitable discovery doctrine in this case. 834 F.3d 816, 822 (7th Cir. 2016). We find the State's analogy unpersuasive as the Seventh Circuit follows the federal inevitable discovery standard, which imposes a preponderance of the evidence burden on the State. Id. at 821. The New Jersey standard, as set out in Sugar II, requires the State to overcome a higher, clear and convincing burden of proof. 100 N.J. at 240.

proven that the results of defendant's buccal swab should be allowed in through inevitable discovery.

## VI.

## A.

Finally, we turn to the State's application under <u>Rule</u> 3:5A for an order to take a new buccal swab. The trial court used an inevitable discovery analysis to parse this request, commenting in so doing that the request was coming very late in the investigatory proceedings -- approximately three and one-half years after the discovery of Katie's body. We observe that the State did not argue for the application of any other test. And, as noted, the court rejected the request essentially for the reasons already given in its previous inevitable discovery ruling.

We are unconvinced that an inevitable discovery framework is correct in these circumstances. The doctrine generally addresses completed searches that cannot be replicated.

A key factor in the trial court's decision here was its perception that the State was seeking to obtain through legal means the same evidence that it had earlier obtained unlawfully. That "look-back" logic would, for example, bar a belated application for a search warrant that would allow the police to lawfully recover a murder weapon it had discovered only through an initial illegal

30

search, and rightly so -- the exclusionary rule would have little meaning if it could be sidestepped by using the fruits of unlawful conduct to secure legal means through which to obtain the same evidence. The exclusionary rule would be stripped of its deterrent value and reduced to a procedural speed bump if such were the case.

But DNA is not an item like guns, drugs, or documents. DNA is different in that immutable evidence lives on. Always. And the breadth of it extends beyond the swab. A new DNA sample might provide the same information as the original sample, but each sample is evidence in its own right -- and the exclusionary rule bars the use of the same evidence that was illegally obtained or "poisoned fruit" evidence that would not have been discovered but for the initial, illegally obtained evidence. The State's request to compel a new sample must therefore be viewed for what it truly is: a request to obtain a new buccal sample -- new evidence -- notwithstanding that it will lead to the same uniquely identifying information that DNA provides. That one's identity does not change and is revealed through DNA does not alter the fact that it is still a new sample.

An easy-to-imagine example illustrates this point. Defendant's buccal swab has been found inadmissible because it was illegally obtained. But there are other ways to obtain a sample of defendant's DNA. If, for example, he

31

were to be seen in a public place drinking from a paper cup, one could not reasonably argue that the State would be precluded from retrieving the cup and testing the DNA sample left on it by defendant. The same reasoning leads to the logical conclusion that if law enforcement has a basis for obtaining a lawful buccal sample, defendant cannot shield his DNA-revealed nontestimonial identifying information because it once was obtained illegally. There is simply no basis to distinguish a subsequent, lawful buccal swab from the lawful collection of DNA from other sources. Both are new evidence.

Rule 3:5A provides law enforcement with an avenue for making a lawful request for a new sample. A properly issued judicial order under Rule 3:5A-4 should be available to law enforcement, on the right terms. Other courts have recognized as much. In the Diaz case from Colorado discussed above, the Colorado Supreme Court took a similar step. 53 P.3d at 1175-78. Despite its holding that the original blood and hair samples must be suppressed, the court determined that under the Colorado Rules of Criminal Procedure, "an illegal seizure of previous identification samples from the defendant by the police does not foreclose the prosecution from obtaining identity evidence through proper means after filing of the case."[9] Id. at 1177. The court reasoned that in

---

[9] Under the Colorado Rules of Criminal Procedure, "[n]otwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, upon request of the prosecuting attorney, the court may require the accused to

32

seeking the new nontestimonial identification evidence, "the prosecution d[id] not rely on information or evidence the police obtained by means of an illegal search and seizure." Ibid.

So the important question to be decided is by what standard the State may obtain a judicial order for the taking of a new buccal swab through a Rule 3:5A application after a prior buccal sample has been suppressed.

### B.

Because the look-back approach that undergirds inevitable discovery seems a poor fit for these circumstances -- where, again, the State seeks not the admission of previously obtained evidence but rather new evidence that will provide the same information as the suppressed evidence -- we fashion a test better tailored for the unique nature of DNA evidence and a fair assessment of whether a second buccal swab sample should be allowed.

The test we envision is derived in part from aspects of the independent source doctrine. Generally, the independent source doctrine allows for the introduction of evidence tainted by unlawful police conduct if the information

---

give any nontestimonial identification." Colo. R. Crim. P. 16(II)(a)(1). Nontestimonial identification "includes, but is not limited to, identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, specimens of material under fingernails, or other reasonable physical or medical examination, handwriting exemplars, voice samples, photographs, appearing in lineups, and trying on articles of clothing." Colo. R. Crim. P. 41.1(h)(2).

33

leading to discovery of the evidence is independent of the previous unlawful

conduct.  See Nix, 467 U.S. at 443.  Similar to the inevitable discovery

doctrine, the State bears the burden of proving that the independent source

doctrine should apply by clear and convincing evidence.  State v. Holland, 176

N.J. 344, 362 (2003).  Under New Jersey law, the State must show that

> probable cause existed to conduct the challenged search without the unlawfully obtained information.  It must make that showing by relying on factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search.  Second, the State must demonstrate . . . that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed.  Third, regardless of the strength of their proofs under the first and second prongs, prosecutors must demonstrate by the same enhanced standard that the initial impermissible search was not the product of flagrant police misconduct.

> [Id. at 360-61.]

Flagrancy is a high bar, requiring active disregard of proper procedure, or

overt attempts to undermine constitutional protections.  See State v. Smith,

212 N.J. 365, 398 (2012) (distinguishing, in the context of a search warrant

affidavit, the omission of details that would undermine a finding of probable

cause from affirmative misstatements for purposes of a flagrant misconduct

analysis); see also State v. Chaney, 318 N.J. Super. 217, 226-27 (App. Div.

34

1999) (finding that the initial unlawful entry by police into a motel room where they discovered contraband was not flagrant misconduct because the "arrest warrants for a person with the same name as defendant, whose last known address was the motel in which defendant was registered," gave police an objectively reasonable basis to believe they were authorized to enter the room).

The test we now tailor for an application under Rule 3:5A for a new buccal swab for DNA, when the previously obtained sample was declared invalid and suppressed, is as follows. First, the State must demonstrate that probable cause exists to conduct the new search. The court should look at the showing advanced by the State to demonstrate probable cause. The evidence may involve the same evidence that existed at the time of the illegal search. We do not exclude its consideration. We permit but do not require new evidence. Thus, Tina's statements and her identification of defendant are not off-limits. Second, the court should determine whether the State's showing of probable cause is untainted by the results of the prior search. Here, we mean that the probable cause must be independent of the information obtained through the results from the prior swab.[10] Third, to deter wrongdoing by the

---

[10] The dissent appears to misapprehend our test. Post at ___ (slip op. at 13). The salient point of Holland's second prong is encompassed in the first and second parts of our test.

35

police, we track the third prong of the independent source doctrine and require the State to show by clear and convincing evidence that the initial impermissible search was not the result of flagrant police misconduct.

Finally, because of the privacy interest involved, we consider the degree of the intrusion posed by the State's second search. A buccal swab is minimally intrusive. King, 569 U.S. at 463. We note that we are considering only a Rule 3:5A application which addresses minimally intrusive identification procedures. See Rolle, 265 N.J. Super. at 486.

We do not attempt to apply this new test on this record. Rather, a remand is in order to allow the State an opportunity to demonstrate whether it can meet the standard announced. There may be additional witnesses and other evidence that it seeks to put before a factfinder. We follow normal procedures and send this back for the trial courts to handle. Because the original judge made extensive credibility determinations about the witnesses before the court, as well as about Tina, who was not before the court, we refer this matter to the Assignment Judge for assignment.

VII.

We affirm in part and reverse in part the judgment of the Appellate Division. We remand this matter to the Superior Court, Law Division for further proceedings consistent with this opinion.

36

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a dissent.

State of New Jersey,

Plaintiff-Appellant,

v.

Rafael Camey,

Defendant-Respondent.

JUSTICE ALBIN, dissenting.

The fundamental rights afforded to a suspect by our Federal and State Constitutions cannot be cut and trimmed to fit the investigatory objectives of law enforcement. Even those under investigation for heinous offenses are entitled to the full protection of the law.

The trial court determined that the police unlawfully secured a buccal swab from defendant Rafael Camey by unconstitutionally detaining him and having him sign a consent form in a language he did not understand and without informing him of his right to refuse. The court found that the police three times unlawfully detained Camey and three times unlawfully interrogated him.

At the conclusion of a testimonial hearing, the court suppressed evidence of the buccal swab and the DNA test results of that swab. The court held that the inevitable discovery doctrine did not allow the taking of a second buccal

swab from Camey because the State had not presented credible evidence that the investigating detective would have secured a warrant through lawful means.

The Appellate Division concluded that the trial court -- based on its detailed factual findings -- did not abuse its discretion in suppressing the buccal swab and forbidding the taking of a second one.

Despite the trial court's proper application of the inevitable discovery doctrine -- the theory presented by the State at the suppression hearing -- the majority reverses. The majority does so based on its newly created and weakened version of the independent source doctrine set forth in State v. Holland, 176 N.J. 344, 360-61 (2003) -- a new test crafted specifically for immutable evidence, such as DNA evidence. The majority, however, retains an important feature of the Holland test -- barring a second search if the initial impermissible search was "the result of flagrant police misconduct." Ante at ___ (slip op. at 36).

In light of that still operable flagrancy factor, the majority's remand for a new suppression hearing before a different judge is not justifiable. The trial court's factfindings were sustained by the Appellate Division and, by any measure, detail police officers engaging in flagrant misconduct in violation of Camey's constitutional rights. On the record before us, given the deference

2

that must be accorded the trial court's factfindings, see State v. Elders, 192 N.J. 224, 244 (2007), the State cannot prove by clear and convincing evidence that the police officers did not engage in flagrant misconduct when they unlawfully detained Camey, unlawfully interrogated him, and unlawfully secured a buccal swab without his consent. Thus, even under the new test, the taking of a second buccal sample is barred.

I dissent because there is no basis to reverse the trial court's suppression order and to remand before a different judge. I also dissent because the majority's retreat from the rigorous Holland test -- the test for determining whether a "seizure of evidence was independent of, and untainted by, earlier illegal police misconduct" -- diminishes the deterrent effect of the exclusionary rule. See 176 N.J. at 360.

I.

A.

The trial court conducted a several day suppression hearing, taking testimony and making credibility determinations. The trial court's detailed factual findings are the starting point of our discussion. Those detailed findings about police misconduct remain valid despite the State's change of legal theory for the admission of a second buccal swab.

The trial court made the following findings.

While investigating the brutal murder of a woman named Katie,[1] an alleged sex worker, the Passaic Police Department secured "consent" to take buccal swabs from at least a dozen homeless people who resided in the area of the murder. Sergeant Roy Bordamonte was the lead investigator. Camey became a "person of interest" during the investigation. The police "grabbed" Camey in a bar, detained him without probable cause, and transported him to headquarters, where he was not free to leave. According to the court, the police engaged in "a blatantly illegal detention."

At headquarters, Detective Alex Flores -- a Spanish-speaking officer -- read Camey his Miranda[2] warnings, but made no "effort to have him understand them." When Camey said, "I don't understand and I don't know," the police did not address his lack of comprehension. Camey spoke virtually no English, had only a second-grade education, and had no prior experience in the criminal justice system. The court concluded that "the State ha[d] not proven beyond a reasonable doubt that the defendant understood and knowingly and voluntarily waived his Miranda rights," and suppressed the statement he made.

---

[1] Katie is a fictitious name assigned to the victim by the majority.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

The police secured a buccal swab from the unlawfully detained Camey for DNA testing -- not by consent but by unlawful means, according to the court. Before taking the buccal swab, the police never translated the English-worded consent form given to the Spanish-speaking Camey, never advised him that he had a right to refuse to consent to the taking of the swab, and never told him that the swab would be sent to a police lab for DNA testing as part of a criminal investigation. While acknowledging "that the police were investigating a terrible crime," the court nevertheless concluded that the police committed "egregious constitutional violations." The police did not arrest Camey, and he was released.

The police unlawfully detained Camey a second time -- without a warrant or probable cause. Camey was "grabbed" while doing his laundry and transported to headquarters for questioning. The trial court described this as a "blatantly illegal detention." According to the court, the police did not ensure that Camey knowingly and voluntarily waived his Miranda rights, and although the statement elicited was "exculpatory," it nonetheless was not the product of a "free will." The court found the police conduct "offensive to [Camey's] due process" rights. Again, Camey was released.

The police unlawfully detained Camey a third time and transported him to headquarters for another round of questioning. Once more, the police failed

to obtain from Camey a valid waiver of his <u>Miranda</u> rights. During a six-and-one-half-hour interrogation, the police did not offer Camey food, although he stated he was "dying of hunger," and did not offer him a bathroom break. During the interrogation, Sergeant Bordamonte verbally abused Camey, calling him a "little freak," a "motherf***ing liar," and a "tutti-frutti." Sergeant Bordamonte threatened Camey that if he persisted in his denials that he would be deprived of water. The court referred to this detention, as it did to the previous two, as "a blatantly illegal detention" during which the police extracted a "legally involuntary" statement.

The police conduct in this case was so shocking to the court that it remarked:

> I have rarely seen such blatant disregard for the most basic of constitutional safeguards. The cited case law talks about techniques that are offensive to due process. The procedures here were beyond offensive. They not only were unfair to the defendant, they were unfair to the victim, since the evidence that was illegally gathered has been suppressed.

### B.

The trial court addressed the legal theories presented by the parties. The State argued that, despite the constitutional violations, the police inevitably would have sought a buccal swab from Camey that linked his DNA to the victim. The court, relying on <u>State v. Sugar</u>, 100 N.J. 214, 238 (1985),

6

rejected the State's inevitable discovery argument because it concluded that Sergeant Bordamonte would not have secured a warrant by lawful means for the buccal swab through ordinary investigative means. The court came to that conclusion based on the entirety of the police conduct toward Camey -- the failure to secure lawful consent for the buccal swab, and the three illegal detentions and three illegal interrogations. The Appellate Division sustained the trial court's factfindings.

The trial court further came to that conclusion because of Bordamonte's infrequent recourse to the warrant procedure during his law enforcement career. For example, in this case, Sergeant Bordamonte did not apply for a warrant to search Camey's home. Nor did Bordamonte apply for a warrant to search the home of the victim's husband, who allegedly had been having "problems" with his wife and who had been arrested for an alleged act of domestic violence against her. In addition, the husband had a previous arrest for aggravated sexual assault and had been fired from his job for showing naked pictures of himself to co-workers just one day before his wife was last seen alive.

Having determined that the State failed to prove by clear and convincing evidence that the police would have proceeded by lawful means to secure a

warrant for the taking of a buccal swab, the court suppressed the DNA results from the first buccal swab and barred the taking of a second one.

C.

The State did not argue the applicability of the independent source doctrine before the trial court or the Appellate Division. That doctrine became the focus of attention for the first time during oral argument before our Court and now has become the doctrinal basis for the majority's new standard as it applies to immutable identification evidence. That new standard is a retreat from the independent source doctrine as articulated in Holland, 176 N.J. at 360-61.

In Holland, this Court determined that when the State procures evidence by unconstitutional means, the State bears the burden of demonstrating that a later "seizure of evidence was independent of, and untainted by, earlier illegal police conduct." 176 N.J. at 360. Under Holland, to establish an independent source for the procuring of evidence untainted by the initial unconstitutional seizure of evidence, the State must satisfy three prongs. Id. at 360-61. First, the State must demonstrate that it relied on "factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search" to prove "that probable cause existed to conduct the challenged search." Ibid. Second, it must establish, "by clear and convincing evidence,

that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed." Id. at 361. Third, it must clearly and convincingly show that "regardless of the strength of their proofs under the first and second prongs, . . . that the initial impermissible search was not the product of flagrant police misconduct." Ibid.

When the initial impermissible search is the product of flagrant misconduct, the independent source doctrine cannot be invoked to justify a subsequent search relating to the initial search. See ibid. In other circumstances, the focus of the Holland test is whether the subsequent search is actually tainted by the "earlier illegal police conduct." See id. at 360. Understanding the potential for the independent source doctrine to undermine the deterrent effect of the exclusionary rule, our Court cautioned:

> Only by rigorously applying the rule's three prongs can we be satisfied that an error of the State's making does not subvert the warrant requirement under Article I, paragraph 7 [of the New Jersey Constitution].
>
> . . . .
>
> We stress that courts must apply scrupulously each part of the test, and that the government's failure to satisfy any one prong of the standard will result in suppression of the challenged evidence.
>
> [Id. at 362-63.]

9

"The jurisdiction of appellate courts rightly is bounded by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19 (2009). The majority has declined to limit itself to the arguments advanced before the trial court and Appellate Division, and in the State's brief for leave to appeal to this Court -- the applicability of the inevitable discovery doctrine. Having decided to look for another doctrinal basis to review a subsequent search for immutable evidence, the majority does not adhere to our well-established jurisprudence on the independent source doctrine.

Here is how the majority has reconfigured the independent source doctrine for immutable evidence. Under the majority's new standard, after an unconstitutional seizure of immutable evidence, (1) the "State must demonstrate that probable cause exists to conduct the new search" and that showing may be based on "the same evidence that existed at the time of the illegal search"; (2) "the court should determine whether the State's showing of probable cause is untainted by the results of the prior search"; and (3) "the State must show by clear and convincing evidence that the initial impermissible search was not the result of flagrant police misconduct." Ante at ___ (slip op. at 35-36).

The majority's test, like the traditional Holland test, bars a subsequent search when the initial impermissible search was the product of flagrant police misconduct. On that basis alone, this Court should affirm the Appellate Division, which determined that the trial court's factfindings were supported by sufficient credible evidence in the record. The trial court never used the term "flagrant police misconduct" because the independent source doctrine had not been invoked by the State. But the court's detailed factfindings referred to what can only be described as flagrant misconduct. The taking of the buccal swab occurred after the police "grabbed" Camey from a bar without a warrant or probable cause and subjected him to a "blatantly illegal detention." The police then interrogated Camey while running roughshod over his Miranda rights -- questioning him even though he did not comprehend his rights. On that same day that the police unlawfully detained Camey and violated his Miranda rights, the police secured Camey's "consent" to a buccal swab by giving him an English-worded consent form that he could not understand and by not advising him that he had a right to refuse to consent to the search. Based on the totality of the circumstances, the trial court concluded that the police had engaged in "egregious constitutional violations."

It can hardly be disputed that the trial court, in functionally equivalent language, found that the initial taking of the buccal swab was "the result of

11

flagrant police misconduct." See ante at ___ (slip op. at 36). The majority states that a finding of flagrancy "requir[es] active disregard of proper procedure, or overt attempts to undermine constitutional protections." Ante at ___ (slip op. at 34). The record is replete with factfindings that satisfy the majority's definition of flagrancy. Based on the deferential standard accorded to a trial court's factfindings, Elders, 192 N.J. at 244, a finding that the police engaged in flagrant misconduct is inescapable.

Because flagrancy is determinative even under the majority's test, a remand is pointless. No further witness-credibility factfindings are required on that issue and therefore a remand to a different trial judge cannot be justified. The trial court thoughtfully and deliberately considered and weighed the testimony and understood the consequences of suppressing evidence that might make it difficult for the State to prosecute Camey for a heinous crime. Suppressing evidence -- evidence secured illegally -- will not receive public adulation, even when our case law demands the result. Despite that reality, the court fulfilled a core judicial function by adhering to the dictates of the Constitution and upholding fundamental rights. The court's well-reasoned decision to suppress the buccal swab evidence and bar the taking of a second buccal swab should be affirmed.

12

## II.

Last, the majority needlessly abandons <u>Holland</u>'s rigorous independent source test in cases of unconstitutional seizure of immutable evidence and therefore diminishes the deterrent effect of the exclusionary rule when the police violate a person's constitutional rights. The majority has discarded <u>Holland</u>'s second prong that requires the State to establish that "the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed." 176 N.J. at 361. The majority has replaced that meaningful prong with one that places little burden on the State for a previous unconstitutional search or seizure.

The majority requires that the State "demonstrate that probable cause exists to conduct the new search," a showing that the majority permits to be based on "the same evidence that existed at the time of the illegal search." <u>Ante</u> at ___ (slip op. at 35). The police, however, must always establish probable cause to conduct a search, whether it is the first or the last one. Additionally, allowing the State to rely on the same evidence to establish probable cause merely permits the police a do-over after a failure to adhere to constitutional dictates. Police officers will have a lesser incentive to get a warrant for the taking of a buccal swab when suppression leads to the police using the same probable-cause evidence to secure a proper search warrant.

Defense attorneys will soon see the futility of filing suppression motions, leading to police practices that are indifferent to the Constitution's warrant requirement. The majority articulates no good reason for jettisoning <u>Holland</u>'s insistence that the State prove that "the police would have sought a warrant without the tainted knowledge" from the evidence acquired from an unconstitutional search. <u>See</u> <u>Holland</u>, 176 N.J. at 361.

III.

For the reasons expressed, I respectfully dissent.