**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1741-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

K.H.,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
> **June 4, 2025**
> **APPELLATE DIVISION**

Submitted February 4, 2025 – Decided June 4, 2025

Before Judges Sumners, Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 22-04-0600.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Debra Grace Simms, Deputy Attorney General, of counsel and on the briefs).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

Defendant K.H. appeals from his jury trial convictions for aggravated sexual assault and burglary. He was sentenced as a persistent offender pursuant to N.J.S.A. 2C:44-3(a) to an aggregate sentence of fifty-four years imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant contends the Law Division judges[1] erred by denying his motion to suppress DNA evidence that police collected with his consent. Specifically, he claims that his consent for a buccal swab test was coerced because it was induced by a quid pro quo promise to release him from police custody. He also argues it was unlawful for detectives to seek his consent after he had invoked his Miranda[2] rights. Aside from challenging the suppression rulings, defendant contends the trial court erred by precluding him from calling the detective who took the buccal swab as a trial witness and imposed an unduly punitive sentence.

After reviewing the record in light of the parties' arguments and governing legal principles, we affirm defendant's convictions. With respect to his sentencing contentions, we are constrained to vacate the extended-term sentence as a persistent offender because his eligibility for the extended term

---

[1] Two judges heard defendant's motion to suppress the DNA evidence. Both judges issued written opinions ruling that the DNA evidence was admissible.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

must be decided by a jury, not a judge, in accordance with the rule announced in Erlinger v. United States, 602 U.S. 821 (2024). We therefore remand for further proceedings as spelled out in State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), certif. granted, ___ N.J. ___ (2025).

I.

We discern the following pertinent facts and procedural history from the record. On July 7, 2020, defendant sexually assaulted hotel housekeeper, M.C.[3] M.C. was assigned to clean guest rooms on the hotel's twelfth floor that day. As she was entering a vacant room, defendant exited the room, apologized, and said that he was using the bathroom.

M.C. assumed that defendant was a guest checking out and proceeded into the bathroom unaware that defendant was following her. He grabbed her by the hair, pulled her back, and threw her to the floor. M.C. screamed and tried to push him off but was unable to prevent him from forcibly removing her pants and vaginally penetrating her with his penis. M.C. knew defendant had ejaculated "because [she] felt the warmth of it inside [her]." Defendant then fled, leaving M.C. lying on the floor. Hotel surveillance video from the hallway outside of the guest room showed images of defendant and M.C.

---

[3] We use initials to protect the identity of the victim. R. 1:38-3(d).

M.C. called her supervisor, who called police. M.C. was taken to a hospital where she met with police and a nurse. The nurse took swabs from her body. Photographs were taken that depict scratches, bruising, and redness to her cheek, neck, knees, left eye, and breasts.

Atlantic City Police Department (ACPD) Officer John Bell was patrolling the boardwalk when he received a report of a sexual assault at the hotel. The assailant was described as a black male with a bald head, wearing a blue t-shirt, khaki shorts, and white sneakers. A security guard from the hotel relayed to police the direction the assailant fled.

Bell encountered a man generally matching the description on the boardwalk two or three blocks from the hotel. Bell detained the man, later identified as defendant, and transported him to the hospital where M.C. was being examined. There, she positively identified defendant as the attacker. Subsequently, police transported defendant to the police station. During the booking process, Bell testified that he noticed a fresh scratch on one of defendant's hands.

ACPD Special Victims Unit Detective Lauren Downey witnessed M.C. identifying defendant as her attacker. After taking M.C.'s statement, Downey left the hospital and went to the police station to interview defendant. She informed him that he was accused of sexual assault. When Downey asked

defendant whether he would agree to answer questions, he declined and invoked his Miranda rights. Defendant remained in police custody.

After a shift change, ACPD Detective Sergeant Christopher Eric Cruse reported for duty. Downey briefed Cruse on the investigation. She advised Cruse that defendant invoked his Miranda rights and declined an interview. As we later explain in more detail, Cruse obtained defendant's consent to a buccal swab examination to obtain a sample of his DNA. The next day, Downey conducted an in-depth interview with M.C., resulting in M.C. providing a buccal swab for DNA analysis.

A forensic scientist with the State Police Laboratory examined the swabs that the forensic nurse had taken and found sperm cells on both the vaginal and cervical swabs. The sample taken from the cervix was then sent for DNA testing. Using a DNA profile developed from defendant's buccal swab, a second forensic scientist determined and testified that the sperm cells belonged to defendant.

In April 2021, defendant was charged by indictment with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and second-degree burglary, N.J.S.A. 2C:18-2(a)(1).

Defendant filed a motion to suppress the results of the DNA test that was performed on the buccal swab, which was collected pursuant to his consent.

Judge Dorothy Incarvito-Garrabrant convened a suppression hearing on November 19, 2021. The State relied on Cruse's testimony at the hearing and defendant testified on his own behalf.

Cruse testified that when he came to work that evening, defendant was already under arrest and had been placed in the ACPD booking/holding area. He was advised that defendant had invoked his <u>Miranda</u> rights, but Cruse believed that he could still lawfully ask defendant to consent to a buccal swab to obtain a DNA sample. Cruse went to the holding area and spoke with defendant about giving a DNA sample. Cruse testified that:

> Well, I just had walked in the back to speak with him in his cell where he was at and then I advised them to bring him up to the front where we would do this procedure. We have an interview area within the detective bureau so once in the detective bureau I would advise him of—we use a consent to search form from the police department and I would have read him that and then he would either have consented, say yay or say no, and then depending on what's said is what happens next.

Cruse then read the ACPD's consent-to-search form to defendant and asked if he would be willing to consent. Cruse stated that defendant consented and signed the form.

Defendant offered a different account at the suppression hearing. He testified that he was arrested, and a female detective interviewed him. He also remembered being interviewed by a male, not Cruse, who gave him his

Miranda rights and asked if he wanted to speak to them. Defendant confirmed that he signed a Miranda card and invoked his rights and refused to speak with the officers. He also claimed that he specifically asked for counsel.[4]

Defendant testified that a few hours later, Cruse came in with another male detective. Defendant claimed:

> [T]hen that's what he told me if I sign the consent form that I can call my wife. Like, I can ask them to call my wife to be released. I'm not from up here so if I'd be released, she can come get me. I wanted to inform her, let her know where I was at.

Defendant also stated that when a detective asked, "do you want to give me your consent for your buccal swab?" he replied "no, I want my counsel." He testified that Cruse did not explain what a buccal swab was or what he wanted it for; "[h]e just said buccal swab and then he just said, oh, well, you just give me consent and you can go home and I can call your wife."

---

[4]  We note the video recording provided upon this court's request shows a female detective, after reading him his rights and asking, "do you desire to waive these rights and answer questions?" Defendant shook his head no and said "uh-uh." He at no point asks for counsel in the video. However, for reasons we explain, we need not exercise original jurisdiction in making a finding of fact on whether defendant asked to confer with an attorney. See Goldfarb v. Solimine, 460 N.J. Super. 22, 37 (App. Div. 2019), aff'd as modified and remanded, 245 N.J. 326 (2021) ("[O]riginal jurisdiction 'should not be exercised in the absence of imperative necessity.'") (quoting City of Newark v. W. Milford Twp., 9 N.J. 301 (1952)); R. 2:10-5. Nor do we need to remand for the trial court to make further factual findings.

Judge Incarvito-Garrabrant denied the suppression motion on January 31, 2021 and issued an eight-page written opinion. Finding defendant not credible, Judge Incarvito-Garrabrant held that the State met its burden and defendant's consent was valid. In addition, she noted that the officers had no duty to inform defendant that the swab sample would be sent to the laboratory for testing, and even if they did not inform him and had an affirmative duty to do so, that circumstance "would not meet the high bar of flagrancy" under the independent source doctrine.

In April 2022, defendant was charged by a superseding indictment with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count one); second-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count two); and first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) (count three).

In May 2022, Judge W. Todd Miller convened a jury trial. During the trial, Judge Miller watched the video recording of defendant having his sample taken, which Cruse earlier denied having been recorded. Based on the review of the video, Judge Miller commented that Cruse's testimony was not as credible as Judge Incarvito-Garrabrant had found it to be at the suppression hearing but still denied the motion to suppress the DNA evidence.

The trial resulted in a hung jury. Following the mistrial, defendant moved for reconsideration of the order denying suppression. On September 8,

2022, Judge Miller heard the motion. In an order accompanied by a nine-page written opinion, he denied the reconsideration motion. Judge Miller found that the video recording of the buccal swab did not support defendant's allegations of coercion, and he failed to show that his rights were violated when the officer requested the swab. However, he stated that even if police did violate defendant's rights, the State satisfied its burden by clear and convincing evidence that the buccal swab would be admissible under the inevitable discovery rule.

Six days later, defendant's second jury trial commenced. Judge Miller granted the State's motion to limit testimony regarding the lawfulness of defendant's consent to the buccal swab. After eight days of testimony, the jury found defendant guilty on all charges.

At the sentencing hearing, Judge Miller granted the State's motion for a discretionary extended-term sentence pursuant to N.J.S.A. 2C:44-3(a), and merged counts one and two with count three. The judge sentenced defendant to fifty-four years of imprisonment subject to NERA and imposed fines and penalties, Megan's Law, N.J.S.A. § 2C:7-1 to 7-23, reporting requirements, and parole supervision for life.

This appeal followed. Defendant raises the following contentions for our consideration:

POINT I

THE CONVICTIONS MUST BE REVERSED BECAUSE DEFENDANT DID NOT PROVIDE VALID CONSENT FOR THE BUCCAL SWAB OBTAINED FROM HIM AFTER HE INVOKED HIS RIGHT TO COUNSEL AND BECAUSE IT WAS BASED ON THE UNCORRECTED MISIMPRESSION THAT HE MIGHT BE RELEASED FROM CUSTODY IF HE CONSENTED.

POINT II

THE CONVICTIONS MUST BE REVERSED BECAUSE DEFENDANT WAS DENIED HIS RIGHTS TO PRESENT A COMPLETE DEFENSE, TO CONFRONTATION, AND TO COMPULSORY PROCESS BY THE TRIAL COURT'S RULING PRECLUDING DEFENDANT FROM CALLING DETECTIVE CRUSE AND IMPEACHING HIM WITH HIS PRIOR FALSE TESTIMONY. U.S. CONST. AMENDS. V, VI, AND XIV; N.J. CONST., ART. I, PARS. 1, 9, AND 10.

POINT III

THE [FIFTY-FOUR]-YEAR NERA SENTENCE IS A DE FACTO LIFE SENTENCE, WHICH CANNOT BE JUSTIFIED BY THE FACTS OF THE CASE NOR FACTORS UNIQUE TO DEFENDANT.

Defendant also raises the following contention in his supplemental brief:

POINT I

SENTENCING DEFENDANT AS A PERSISTENT OFFENDER WITHOUT GRAND AND PETIT JURY FINDINGS OF THE PREDICATE FACTS VIOLATED DUE PROCESS AND HIS RIGHT TO A JURY TRIAL.

10

On March 31, 2025, defendant filed an additional citation letter pursuant to R. 2:6-11(d) based on our recent decision in State v. Amang, ___ N.J. Super. ___ (App. Div. 2025), arguing that case requires a finding that defendant's consent was "presumptively involuntary."

## II.

### A.

We first address defendant's contention the trial courts erred in denying his motion to suppress the DNA evidence taken from him. Our review of a decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). Appellate courts defer to those factual findings because of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 243 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Accordingly, we "ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v.

Gamble, 218 N.J. 412, 425 (2014)).  In contrast, our review of legal conclusions drawn from those facts is de novo.  State v. Radel, 249 N.J. 469, 493 (2022); see also Gamble, 218 N.J. at 425 ("A trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference.").

B.

Turning to substantive legal principles, "[t]he Fourth Amendment and Article I, Paragraph 7 of the State Constitution guarantee individuals the right to be free from unreasonable searches and seizures."  State v. Carter, 247 N.J. 488, 524 (2021).  The State does not dispute the administration of a buccal swab to obtain a DNA sample constitutes a search.  See State v. Gathers, 234 N.J. 208, 221 (2018).

Furthermore, "[o]ur constitutional jurisprudence expresses a decided preference that government officials first secure a warrant before conducting a search of a home or a person."  State v. Cope, 224 N.J. 530, 545-46 (2016) (quoting State v. Watts, 223 N.J. 503, 513 (2015)).  That preference finds expression in the bedrock principle that warrantless seizures are presumptively invalid.  See Goldsmith, 251 N.J. at 398.  "To justify a warrantless search or seizure, 'the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure falls within one of the few

12

well-delineated exceptions to the warrant requirement.'" State v. Vanderee, 476 N.J. Super. 214, 230 (App. Div. 2023), certif. denied, 255 N.J. 506 (2023) (alteration in original) (quoting State v. Chisum, 236 N.J. 530, 546 (2019)).

A consent search is one of the well-defined exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Johnson, 68 N.J. 349, 353-54 (1975); State v. King, 44 N.J. 346, 352 (1965). It is fundamental that consent to search must be voluntary. Bustamonte, 412 U.S. at 222. Moreover, under the New Jersey Constitution, a consent to search is valid only if the State proves the person giving consent has knowledge of their right to refuse. Johnson, 68 N.J. at 353-54.

In deciding whether consent to search was voluntarily and knowingly given, a reviewing court must consider the totality of the circumstances. King, 44 N.J. at 352-53; State v. Hagans, 233 N.J. 30, 42-43 (2018). "Voluntariness is a question of fact to be determined from all the circumstances." Bustamonte, 412 U.S. at 248-49. To meet its burden of proof, the State is required to prove voluntariness by "clear and positive testimony." King, 44 N.J. at 352; State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985).

In King, the Court articulated factors for a court to consider in deciding whether consent was coerced, which include:

> (1) that consent was made by an individual already
> arrested; (2) that consent was obtained despite a denial

of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.

[Id. at 352-353 (citations omitted).]

Factors potentially indicating voluntariness of consent include: "(1) that consent was given where the accused had reason to believe the police would find no contraband; (2) that the defendant admitted [their] guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers." Id. at 353 (citations omitted).

## C.

Defendant contends the State failed to prove that he knowingly, intelligently, and voluntarily consented to the buccal swab, claiming he was coerced because the police offered him a quid pro quo deal to release him from custody if he granted consent.

After hearing testimony from defendant and Cruse, Judge Incarvito-Garrabrant denied the motion to suppress. She found that Cruse "obtained a valid, voluntary, knowing, and intelligent consent and signature from [d]efendant." Judge Incarvito-Garrabrant concluded, "[d]efendant's allegation that he was coerced into providing the sample with the false promise that he

14

would be able to call his wife and go home was not credible, based on the totality of the circumstances herein." She found defendant's testimony inconsistent and self-serving.

As we have noted, Judge Miller also made credibility findings in deciding defendant's motion for reconsideration. Although Judge Miller concluded that Cruse's testimony was not as credible as Judge Incarvito-Garrabrant had found, Judge Miller nonetheless rejected defendant's contentions with respect to the alleged "quid pro quo" arrangement.

Specifically, Judge Miller found that defendant's contention that "an off the record conversation took place in the hallway, outside the interrogation room, resulting in a quid pro quo e.g., 'you can consent to a buccal swab, and we'll let you go home'" was not supported by the video recording from the interrogation room. Judge Miller cited Cruse's response that he did not know whether defendant could go home due to the ongoing investigation. The judge also noted defendant "did not challenge or reiterate any prior commitment or promise about his relief." He further stressed the warnings read to defendant included the following: "I have knowingly and voluntarily given my consent to search without fear, threat, or promise express or implied." Judge Miller thus concluded defendant was informed of his rights and gave valid consent.

D.

Defendant contends that both judges erred in assessing voluntariness by not accounting for the fact that that defendant had invoked his <u>Miranda</u> rights before he was asked to consent to providing a DNA sample.  In <u>Amang</u>, we recently addressed a situation where the defendant had unequivocally invoked his right to confer with an attorney after he was read the <u>Miranda</u> warnings, and detectives subsequently went back to him while he was still in custody to ask for consent to search his home. ___ N.J. Super. ___ (slip op. at 2-3). We established a bright-line rule precluding police from asking for consent from a person in custody after asserting the right to confer with an attorney during the administration of <u>Miranda</u> warnings.  <u>Id.</u> at ___ (slip op. at 5).  We held that:

> When viewed through the lens of the heightened protections accorded to suspects in custody under the New Jersey Constitution and our common law, we conclude the approach most consistent with our jurisprudential values is to establish a simple rule that provides clear guidance to police:  when a person in custody asks to speak with an attorney, police should not thereafter request the arrestee to consent to a search when there has been no break in custody.
>
> [<u>Ibid.</u>]

In the matter before us, while it is undisputed that defendant invoked his <u>Miranda</u> rights, neither judge made a clear finding that defendant specifically asked to confer with an attorney.  The distinction is important because our

A-1741-22

decision in <u>Amang</u> focused on the right to the assistance of counsel, not the right to remain silent. We noted there:

> The right to confer with an attorney is sui generis because it is not an end unto itself; rather, it serves to safeguard and effectuate other rights. The right to confer with counsel guaranteed in <u>Miranda</u> is thus said to be "ancillary" to the right against self-incrimination. <u>See</u> [State v.]<u>Reed</u>, 133 N.J. [237,] 251, 253 [(1993)]. It is universally accepted, for example, that attorneys have the "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." [<u>Id.</u>] [] at 262 (quoting <u>Fare v. Michael C.</u>, 442 U.S. 707, 719 (1979)).
>
> [<u>Amang</u>, ___ N.J. Super. at ___ (slip op. at 20).]

We hold the categorical rule announced in <u>Amang</u> is triggered only by an arrestee's assertion of the right to confer with an attorney, not by their assertion of the right to remain silent. While defendant contends that he made such a request, he was generally found not credible. Still, neither judge made a finding on whether defendant had asked to confer with counsel when he exercised his <u>Miranda</u> rights and declined to be interviewed. In this instance, there is no point in remanding for further fact-finding on whether defendant asserted his right to counsel—which would invoke the bright-line rule announced in <u>Amang</u> precluding a subsequent request to consent to a search—because we agree with Judge Miller's conclusion that even if the consent was

17

invalid, police would inevitably have obtained his DNA to compare against the DNA recovered from the victim.

E.

Before we explain our reasons for upholding the trial court's inevitable discovery ruling, we deem it appropriate to comment on the dispute over whether defendant had asserted the right to confer with an attorney when he invoked his Miranda rights. We note that the Miranda waiver form used in this case, like the one used in Amang, documents whether the arrestee invoked Miranda rights, but does not memorialize whether defendant asked to confer with counsel, asserted the right to remain silent, or both. The distinction between these assertions is important for reasons beyond whether police may thereafter ask an arrestee to consent to a search under the Amang rule—a question arising under the Fourth Amendment and Article I, Paragraph 7. The distinction is critical to complying with an arrestee's Fifth Amendment rights as well.

In State v. Hartley, our Supreme Court held "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether [their] 'right to cut off questioning' was 'scrupulously honored.'" 103 N.J. 252, 261 (1986) (quoting Michigan v. Mosley, 423 U.S. 96, 102-03 (1975)). The Court added, "the decision of a

18

suspect to remain silent is 'scrupulously honored' when (1) the police do not approach [the suspect] for two hours, (2) [the suspect] receives fresh Miranda warnings, (3) [the suspect] is questioned by a different officer, and (4) [the suspect] is questioned in respect of an offense different from the one for which [the suspect] is in custody." Id. at 266.

The rules of engagement are stricter, however, when the arrestee makes a request for counsel. In Edwards v. Arizona, the United States Supreme Court held that if "an accused has invoked [their] right to have counsel present during custodial interrogation," the questioning must cease and cannot resume "until counsel has been made available to [the accused], unless the accused [on their own] initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85 (1981). Additionally, "officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with [their] attorney." Minnick v. Mississippi, 498 U.S. 146, 153 (1990). Thus, unlike the analysis used when interrogation resumes after an interrogee asserts the right to remain silent/stop interrogation, the Edwards rule is not subject to an attenuation analysis based on how much time has elapsed between the assertion of the right and resumption of interrogation. See State v. Rivas, 251 N.J. 132, 160-61 (2022).

To ensure compliance with <u>Edwards</u>, officers who interact with an arrestee after they "invoke their <u>Miranda</u> rights" need to know whether interrogation can resume after a two-hour respite, or whether the arrestee is essentially off-limits for further police-initiated questioning. Although this information might be gleaned by reviewing an electronic recording of the <u>Miranda</u> colloquy, <u>see</u> <u>Rule</u> 3:17, it would make sense to memorialize in writing the specific nature of the invocation of <u>Miranda</u> rights. We thus commend to the Attorney General as the State's chief law enforcement officer, and to the County Prosecutors Association as the chief law enforcement officers in their respective jurisdictions, to consider whether standardized <u>Miranda</u> waiver forms should be revised to facilitate the documentation of whether an arrestee asserted the right to confer with counsel, the right to remain silent, or both rights.

F.

That said, we proceed to address the inevitable discovery exception to the exclusionary rule, which is a species of harmless constitutional error. The doctrine permits admission of evidence resulting from an illegal search where the prosecution can show that it would have discovered the evidence "had no illegality occurred." <u>State v. Sugar</u> (<u>Sugar II</u>), 100 N.J. 214, 238 (1985). The purpose of the inevitable discovery doctrine is to "prevent[ ] the prosecution

20

from being in a better position than if the illegal conduct had not taken place," not to "punish the prosecution by putting it in a worse place."  State v. Caronna, 469 N.J. Super. 462, 500 (App. Div. 2021) (alteration in original) (emphasis omitted) (quoting State v. Camey, 239 N.J. 282, 302 (2019)).

Camey also addressed the admissibility of a buccal swab for DNA evidence.  The Court explained, "[w]hereas consent can serve as an exception to the warrant requirement, the inevitable discovery doctrine can preserve—if certain conditions are satisfied—the admissibility of evidence obtained without a warrant or a valid exception to the warrant requirement."  Camey, 239 N.J. at 301.  The evidence "obtained through law enforcement's unconstitutional conduct" is admissible "if that evidence would have been discovered in the absence of that unlawful conduct."  Ibid.  To invoke the inevitable discovery exception, the State must demonstrate, by clear and convincing evidence:

> (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Sugar II, 100 N.J. at 240, 238.]

21

The State is not required to demonstrate the exact circumstances that would result in the discovery of the evidence. Camey, 239 N.J. at 302 (quoting State v. Maltese, 222 N.J. 525, 552 (2015)). "[T]he State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered." Ibid. (quoting State v. Sugar (Sugar III), 108 N.J. 151, 159 (1987)).

Defendant contends the judges' factual findings with respect to the inevitable discovery exception were "clearly mistaken." We disagree. The record amply supports a finding that all three prongs are met.

Further, the DNA evidence collected from defendant would also be admissible under the independent source doctrine, which is closely related to the inevitable discovery doctrine. In Camey, the Court explained that under the independent source doctrine, the State must show:

> [P]robable cause existed to conduct the challenged search without the unlawfully obtained information. It must make that showing by relying on factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search. Second, the State must demonstrate . . . that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed. Third, regardless of the strength of their proofs under the first and second

A-1741-22

prongs, prosecutors must demonstrate by the same enhanced standard that the initial impermissible search was not the product of flagrant police misconduct.

[Id. at 310 (quoting State v. Holland, 176 N.J. 344, 360-61 (2003)).]

We are unpersuaded by defendant's contention that the trial judges erred in assessing the flagrancy prong of the independent source doctrine. Specifically, defendant argues:

> [E]ven assuming that Cruse did not make any unrecorded promises, Cruse's conduct was flagrant: Cruse lied to defendant when defendant asked if he could go home to kiss his wife; Cruse knew that defendant had invoked his right to silence before seeking his consent; Cruse did not explain to defendant the purpose of taking buccal swabs; and Cruse secured defendant's consent where the surrounding circumstances overwhelmingly demonstrated that a person in defendant's shoes would not have felt free to refuse.

The Camey Court stressed that "[f]lagrancy is a high bar, requiring active disregard of proper procedure, or overt attempts to undermine constitutional protections." Ibid. Nothing in the record supports that level of flagrancy.

## III.

We turn next to defendant's contention that Judge Miller's decision to preclude Cruse from testifying deprived defendant of a fair trial. He argues

23

A-1741-22

the trial court "denied [him of] his rights to present a complete defense, to confrontation, and to compulsory process."

On September 8, 2022, after defendant's motion to suppress was denied, the State indicated that it would file a N.J.R.E. 403 motion to bar Cruse's testimony regarding any alleged conversations between defendant and Cruse in the hallway. The State noted it would call ACPD Detective Joshua Schwenger to testify at the second trial, instead of Cruse, concerning the collection of defendant's DNA. Judge Miller indicated he would rule on the motion when it was filed.

During jury selection, the State advised Judge Miller that defense counsel had subpoenaed Cruse as a trial witness. It anticipated that defense counsel would likely attempt to relitigate the buccal swab's admissibility and argued that Cruse's testimony would confuse jurors and waste time since Schwenger would be testifying. Judge Miller preliminarily indicated that if Cruse testified at trial, any issue relating to the swab's admissibility could not be brought to the jury as the issue had been litigated and adjudicated. However, the judge also indicated that "[a]ll other things related to [Cruse] I think are fair game" and "defense can subpoena him and call him for that purpose."

24

After the State rested, Judge Miller conducted a N.J.R.E. 104 hearing regarding Cruse's expected testimony. Defense counsel stated:

> . . . I'm going to ask [Cruse] questions about how he participated in this investigation. Specific relevance is to the chain of custody of the buccal swab, as well as his interaction with [defendant].
>
> He made a number of inconsistent statements and I'm going to bring that out during the course of questioning him.

Judge Miller reminded counsel that he already made a legal ruling regarding the buccal swab's admissibility and stated, "[m]y understanding . . . so far is that [Cruse]'s role in this matter was primarily in obtaining the buccal swab."

Cruse also testified at the hearing and the State presented the video of defendant's buccal swab at the police station. Judge Miller ruled that Cruse would not be permitted to testify at trial. The judge acknowledged the detectives' report was "wrong," but stated the video clarifies that the swab was done correctly. Trial testimony, moreover, showed the chain of custody from ACPD Detective Lori Nolan to the New Jersey State Police DNA and Serology labs to its return to the ACPD, which confirmed that the DNA was defendant's. Judge Miller concluded:

> [A]s I heard [Cruse]'s testimony I don't think it would be helpful to the [jury]. I think it would be confusing. We're raising issues that I've already ruled on . . . .

25

> And—any evidence—and whiff of coercion alternatively it would come under inevitable discovery. But, I didn't find it was coercion.

Thus, the judge held that the probative value of the detective's testimony would be substantially outweighed by its prejudice.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee criminal defendants the right to confront the witnesses against them. That right is "an essential attribute of the right to a fair trial" as it "secures for a defendant the 'fair opportunity to defend against the State's accusations.'" State v. Medina, 242 N.J. 397, 412 (2020) (first quoting State v. Branch, 182 N.J. 338, 348 (2005); and then quoting State v. Garron, 177 N.J. 147, 169 (2003)).

"In addition, our evidence rules underscore that principle by permitting the accused to cross-examine witnesses about the subject matter of any direct examination and matters affecting the witnesses' credibility." State v. Jackson, 243 N.J. 52, 65 (2020) (citing N.J.R.E. 611(b)). Importantly, a witness's "motivation in testifying" can be explored through cross-examination. Ibid. (citing Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)); see also State v. Bass, 224 N.J. 285, 301 (2016).

While N.J.R.E. 402 generally provides that all relevant evidence is admissible, evidence may nonetheless be excluded if its probative value is

26

substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury; or (b) undue delay, waste of time, or needless presentation of cumulative evidence. N.J.R.E. 403; see State v. Cole, 229 N.J. 430, 448 (2017). The burden is on the party urging exclusion of evidence to convince the court that the considerations of N.J.R.E. 403 should control. State v. Santamaria, 236 N.J. 390, 406 (2019). In performing the weighing process, the trial judge's discretion is broad and will not be disturbed on appeal unless it can be shown that there was a palpable abuse of discretion, a finding so wide of the mark that a manifest denial of justice resulted. Cole, 229 N.J. at 449; State v. Nantambu, 221 N.J. 390, 402 (2015).

As Judge Miller correctly found, Cruse's role in the investigation was limited to administering the buccal swab. Defense counsel represented that he planned to use Cruse to challenge the chain of custody of defendant's buccal swab. However, it bears emphasis, the State presented multiple witnesses, including the forensic scientists and Detective Schwenger, who was in the room when the swab was taken.

Defense counsel represented that he also intended to ask Cruse about inconsistencies in his prior statements. As Judge Miller noted, the issue of coerced consent to search had already been decided by the court. The lawfulness of the consent was not a matter for the jury to consider, and the

inconsistencies defense counsel sought to expose to the jury related to the validity of the consent, not the validity of the DNA comparison that showed defendant penetrated and ejaculated into the victim. We are satisfied that Judge Miller's evidentiary ruling is supported by competent, credible evidence and does not constitute an abuse of discretion.

But even assuming for the sake of argument the judge erred in excluding Cruse as a witness, that ruling would not constitute reversible error. When applying the harmful error standard, a reviewing court assesses whether the alleged "error [was] 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" Jackson, 243 N.J. at 73 (alteration in original) (quoting State v. Prall, 231 N.J. 567, 581 (2018)); see State v. G.E.P., 243 N.J. 362, 389 (2020) (explaining that when a defendant objects to an alleged error at trial, the appellate court reviews for "harmful error," which prompts an analysis of "whether in all the circumstances there [is] a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits") (alteration in original) (quoting State v. Mohammed, 226 N.J. 71, 86-87 (2016)). In this instance, in light of the overwhelming evidence the State presented, we are satisfied that precluding the defense from calling Cruse did not taint the jury verdict. See Jackson, 243 N.J. at 73 ("This Court will not reverse any error by the trial

court 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'") (quoting State v. Castagna, 187 N.J. 293, 312 (2006)); R. 2:10-2. We emphasize that Cruse was not a witness to the crime, nor did defendant confess or make an admission to him. The DNA evidence was, without question, compelling, but not because of the manner that Cruse collected it, which was video recorded.

## IV.

Although we affirm defendant's convictions, we are constrained to reverse and remand for resentencing because the judge, not a jury, determined the applicability of the persistent offender extended term of imprisonment in violation of the rule set forth in Erlinger, 602 U.S. at 821. In Erlinger, the United States Supreme Court held that "[t]he Fifth and Sixth Amendments require a unanimous jury" and not a judge, to decide whether a defendant's prior convictions used to establish the basis for enhanced sentencing have been proven beyond a reasonable doubt. Id. at 825.

In State v. Carlton we held, pursuant to Erlinger, "a unanimous jury must find beyond a reasonable doubt that all . . . of the [N.J.S.A. 2C:44-3(a)] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." 480 N.J. Super. at 328-29. We also concluded that

29

the application of <u>Erlinger</u>'s holding to the persistent offender statute applies retroactively to pipeline cases.  <u>Id.</u> at 337; <u>see also</u> <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past").

We provided instructions for how the proceedings on remand should be conducted.  If, on remand, the State "elect[s] to forego pursuing an extended term," then defendant shall be resentenced within the ordinary range for the crimes for which he was found guilty.  <u>Id.</u> at 355.

If, on the other hand, the State elects to request the "imposition of the persistent-offender extended term and there is no post-conviction agreement" between the State and defendant, "the trial judge shall convene a jury for trial limited to the question of whether defendant meets the definition of a persistent offender set forth in N.J.S.A. 2C:44-3(a)."  <u>Id.</u> at 356.  At the sentencing trial, the State has:

> [T]he burden of proving beyond a reasonable doubt all facts and circumstances needed to establish extended-term eligibility under N.J.S.A. 2C:44-3(a), including not only that the prior convictions were entered on separate occasions and the prior crimes were committed at different times, but also that defendant was [twenty-one] years of age or older when the present crime was committed, that defendant was at

30

least eighteen years of age when the prior crimes were committed, and that the latest of the prior convictions or the date of defendant's last release from confinement, whichever is later, is within ten years of the date of the crime for which defendant is being sentenced.

[Ibid.]

Because a remand is required for a limited trial on the facts and circumstances needed to established extended-term eligibility and resentencing, we need not further analyze defendant's arguments pertaining to his contention the sentence he received was unduly punitive. We instruct the parties to provide the remand court with copies of their appeals briefs so that the court will have the benefit of the parties' appellate arguments when imposing an appropriate sentence following a jury's determination of whether defendant is eligible for a persistent offender extended term of imprisonment.

Finally, we note that during the pendency of this appeal, the New Jersey Supreme Court granted certification to hear Carlton. Nothing in this opinion should be construed to require the remand court to convene a jury trial to determine defendant's eligibility for a persistent offender extended term sentence before the Supreme Court renders its decision in Carlton. The remand court may in the exercise of its discretion delay convening such a trial pending the Supreme Court's decision. The remand court in its discretion may also allow the parties to reach a negotiated resolution of the Erlinger issue.

Affirmed in part and reversed and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1741-22